¶ 1. Marcus Whitehead was convicted of two counts of aggravated assault by a Hinds County jury. He was sentenced to consecutive terms of twenty years on each count in the custody of the Mississippi Department of Corrections. Aggrieved, Whitehead appeals and asserts (1) that he was denied his due process right to a fair trial, and (2) that the trial court abused its discretion in overruling certain objections and in denying his motion for a mistrial.[1]
 ¶ 2. Finding no error, we affirm.
 FACTS ¶ 3. Around 3:00 a.m. on November 8, 2003, Dominique Land, Tikeshia Land's daughter, alerted Tikeshia that someone was "pounding" on the door of their apartment at the North Colony Apartment complex in Jackson, Mississippi. Tikeshia opened the door and discovered that it was Whitehead. She allowed him to enter.[2] Once inside, Whitehead asked for some water and went into the kitchen to get the water. In the meantime, Takeshia sat on the couch and instructed Dominique to return to bed. When Whitehead returned from the kitchen, he began to stab Tikeshia in the neck with a knife. Dominique heard her mother's screams and came to her rescue by jumping on Whitehead's back in an effort to stop him from stabbing her mother. Whitehead threw Dominique across the across the room and at some point stabbed her in the eye.
 ¶ 4. At trial, Tikeshia and Dominique, as well as other witnesses, testified against *Page 59 
Whitehead. However, since Whitehead does not challenge the sufficiency of the evidence against him, we dispense with a recitation of all the facts surrounding the crimes and will only relate additional facts, as appropriate, during our discussion of the issues.
 ANALYSIS AND DISCUSSION OF THE ISSUES 1. Denial of Due Process and Right to a Fair Trial
 ¶ 5. Under this issue, Whitehead argues that he is entitled to a new trial because the prosecutor engaged in improper conduct during her opening statement, her cross-examination of him, and during her closing argument. The Mississippi Supreme Court has held that "where the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused and to secure a decision influenced by the prejudice so created, a new trial should be granted." Craft v. State, 226 Miss. 426,435, 84 So.2d 531, 535 (1956). Therefore, we examine the instances of alleged misconduct in light of this standard.
 ¶ 6. In the first instance of alleged prosecutorial misconduct, the prosecutor made the following comment during her opening statement:
 The last thing that you will hear, you will hear from Detective Amos Clinton. He's the detective that handled this case. He is going to testify about the statement that this defendant gave, and the fact that [the defendant] apparently had no knowledge of who Tikeshia Land or Dominique Land was until [the defendant] asked the Police Department, "did you get any fingerprints." At that point he refused to talk to the police after that.
Our review of the record reveals that the prosecutor was technically incorrect because, although Whitehead stopped relating his version of what occurred on the night of the stabbings, he did in fact continue to talk to the officers. Notwithstanding this fact, the prosecutor's remark was not a comment on Whitehead's constitutional right to remain silent, because Whitehead waived this right by signing a waiver of rights form and did not subsequently invoke it. Therefore, there is no merit to this issue.
 ¶ 7. In the second incident of alleged misconduct, Whitehead directs our attention to the following remark, also made during the prosecutor's opening statement:
 The other part of this is Ms. Land, Tikeshia Land, is going to tell you, she's not real proud of this, but she had just gotten out of a long term relationship. She had been with a man for about three, three and a half years, has children with him. She had broken off with him about a month earlier. Mr. Whitehead starts coming snooping around. And Ms. Land is going to tell you —
Whitehead argues that the prosecutor's characterization of him as "snooping around" contributed to the denial of his right to a fair trial.
 ¶ 8. Whitehead also argues that the prosecutor's conduct was magnified by the "completely disrespectful manner in which the prosecutor cross-examined [him] by repeating questions [he] had previously answered, repeatedly asking him how Land and Dominique were stabbed when [he] insisted he did not know and continually interrupting his attempts to respond." We quote the specific exchange which according to Whitehead denied him a right to a fair trial:
 Q. Mr. Whitehead, did you stand up in front of Judge Yerger and put your *Page 60 
hand on a Bible and swear to tell the truth?
 A. Yes, sir — I mean, yes, ma'am.
 Q. Do you understand what that means?
 A. Yes, ma'am.
 BY [ATTORNEY FOR DEFENDANT]: We're going to object, your Honor —
 BY [ATTORNEY FOR STATE]: Your Honor —
 BY [ATTORNEY FOR DEFENDANT]: That's not an appropriate question. He took the oath just like any —
 BY [ATTORNEY FOR THE STATE]: I can ask him about the oath that he took —
 BY [ATTORNEY FOR DEFENDANT]: I'm sorry. Can I finish my objection, Judge?
 BY THE COURT: All right.
 BY [ATTORNEY FOR DEFENDANT]: He took the oath just like any other witness. You can't ask him about that. The jury knows he did that.
 BY THE COURT: You can ask him if he took the oath to tell the truth. Sustained.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Did you take an oath to tell the truth?
 A. Yes, ma'am.
 BY [ATTORNEY FOR DEFENDANT]: Asked and answered, your Honor.
 BY [ATTORNEY FOR THE STATE]: Your Honor, you just said I could ask the question.
 BY THE COURT: Overruled.
 BY [ATTORNEY FOR THE STATE]: Thank you.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Let me ask you again. Do you remember just about 10 minutes ago standing up there and swearing to tell the truth?
 A. Yes, ma'am.
 Q. To God?
 A. Yes, ma'am.
 Q. Is that what you say you're doing right now?
 A. Yes, ma'am.
 Q. And is this the first time in almost two years that anybody has ever heard this story that Tamika [sic] Land attacked you? Is that [the] first time anybody has ever heard it?
 A. I don't know, ma'am.
 Q. Well, did you tell Detective Clinton — I guess Detective Clinton left. Did you tell Detective Clinton?
 A. No ma'am.
 Q. Well, he gave you ample opportunity. Didn't he say you could have written anything that you wanted on Exhibit 24? You could have told him anything that you wanted; is that right?
 A. Yes, ma'am.
 Q. You could have said Tamika [sic]Land loved that sex with you so much that —
 BY [ATTORNEY FOR DEFENDANT]: Judge, we're going to object to the form of this question. That's way out of line.
 BY [ATTORNEY FOR THE STATE]: Your Honor, he's on cross.
 BY [ATTORNEY FOR DEFENDANT]: I mean, she could say you can ask anything in the world.
 BY THE COURT: Well —
 BY [ATTORNEY FOR DEFENDANT]: She can make up anything she wants to at this point, Judge.
 BY THE COURT: Object to that question. Sustained — I mean sustain the objection. *Page 61 
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. You could have told Detective Clinton that this story that the first time anybody is hearing is today, that Tamika [sic] Land attacked you. Isn't that what you're telling this jury?
 A. I could have told him.
 Q. And you didn't?
 A. No ma'am.
 Q. Why not?
 A. Afraid.
 Q. Afraid of what?
 A. To be in the situation that I am now.
 Q. Well, don't you think if you tell the truth that that's what's supposed to release you?
 A. Yes, ma'am.
 Q. Okay. And you didn't do that?
 A. No, ma'am.
 Q. And today is the first time anybody is ever hearing it —
 BY [ATTORNEY FOR DEFENDANT]: We're going to object, your Honor. This has been asked and answered four times by my count at this point. This is the first time you said this. That's asked and answered.
 BY [ATTORNEY FOR THE STATE]: Your Honor, he's on cross.
 BY [ATTORNEY FOR DEFENDANT]: Well, how many times does he have to answer the same question?
 BY THE COURT: Well, I'll let her ask it. Proceed.
 BY [ATTORNEY FOR THE STATE]: I'll move on.
 BY THE COURT: All right. Move on.
 * * * *
 Q. Now, you will agree with me that this all happened in Hinds County? Did it happen in Hinds County?
 A. Jackson, yes, ma'am.
 Q. And it happened at 72 Copperfield Court?
 A. Yes, ma'am.
 Q. North Colony Apartments?
 A. Yes, ma'am.
 Q. And you're not denying that Tikeshia Land and Dominique Land got stabbed that night, are you?
 A. I'm not denying it.
 Q. I said are you denying that they got stabbed that night?
 A. No, I'm not denying that.
 Q. Who stabbed them?
 A. I don't know, ma'am.
 Q. You didn't stab them?
 A. It wasn't me.
 Q. Are you denying that Ms. Tikeshia Land got stabbed 25 times?
 A. I don't know, ma'am, what happened.
 Q. Do you think she stabbed herself?
 BY [ATTORNEY FOR DEFENDANT]: Judge, we're going to object.
 BY [ATTORNEY FOR THE STATE]: Your Honor, I can ask —
 BY THE COURT: It's on cross-examination. Overruled.
 BY [ATTORNEY FOR THE STATE]: Thank you.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Did she stab herself 25 times in the throat, slashing her throat to the point that she had to have a trachea put in, and stab herself in the stomach to the point that she had to have her stomach opened? Is that what she did because of you?
 A. I mean, we were just struggling there. I wasn't fixing to let the knife touch me, you know. I wasn't — we were struggling. *Page 62 
 Q. You weren't going to let the knife touch you, so what did you do?
 A. I had her arms. I had her arms with both my arms.
 Q. Were you making her stab herself?
 A. No. No, ma'am.
 Q. So how was she stabbed, then?
 A. Through the struggle. Had to be through the struggle.
 Q. Through the struggle.
 A. Because I, Marcus Whitehead, didn't stab her. I didn't stab her. I didn't go over there to stab her.
 Q. So some way this woman had a knife in her hand, and during the struggle she managed to stab herself 25 times?
 BY [ATTORNEY FOR DEFENDANT]: Judge, there's no testimony about 25 stab wounds. There's no medical testimony about numbers of wounds at all.
 BY [ATTORNEY FOR THE STATE]: Your Honor, this woman testified that she was stabbed 25 times.
 BY THE COURT: Overruled. Overruled.
 BY [ATTORNEY FOR DEFENDANT]: Thank you, your Honor.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. So somehow the knife that was in her own hand, she managed to stab herself 25 times when she was struggling with you because she didn't want you to leave her. Is that what you're saying?
 A. Ma'am, we was struggling over the knife.
 Q. Why were you struggling over the knife.
 A. I didn't want to get stabbed by no knife, ma'am.
 Q. Did you think she wanted to get stabbed?
 BY [ATTORNEY FOR DEFENDANT]: We're going to object, your Honor.
 BY THE COURT: Sustained.
 BY [ATTORNEY FOR DEFENDANT]: He's not competent to answer such a question. She knows that.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Explain this to me. How did she get stabbed? I don't understand the concept of how she got stabbed.
 BY [ATTORNEY FOR DEFENDANT]: Judge, this has been asked and answered three times now.
 BY [ATTORNEY FOR THE STATE]: He has not answered it.
 BY [ATTORNEY FOR DEFENDANT]: The same question has been asked and he has given an answer three times in a row now. She is not getting the answer she wants to hear, so we're going to object.
 BY THE COURT: All right. Sustained to the extent that you need to ask him about any more specifics. But don't repeat the same question.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. How did Dominique Land get stabbed?
 BY [ATTORNEY FOR DEFENDANT]: That was the objection —
 BY [ATTORNEY FOR THE STATE]: Your Honor, that's a different person —
 BY [ATTORNEY FOR DEFENDANT]: That's exactly —
 BY [ATTORNEY FOR THE STATE]: It's a different person. I've not asked this question.
 BY THE COURT: Overruled. *Page 63 
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. How did a nine year old little girl get stabbed in her right eye?
 A. Ma'am, I don't know. Only thing I know is that I was tussling with Tamika [sic] Land. I —
 Q. And did Dominique Land —
 BY [ATTORNEY FOR DEFENDANT]: We're going to object to her interrupting —
 BY [ATTORNEY FOR THE STATE]: I'm sorry.
 BY [ATTORNEY FOR DEFENDANT]: He was not finished with his —
 BY [ATTORNEY FOR STATE]: Go ahead. Finish. I apologize.
 BY [ATTORNEY FOR DEFENDANT]: Excuse me, your Honor. Can I just please get my objection finished before being interrupted?
 BY THE COURT: Let him finish his objection.
 BY [ATTORNEY FOR DEFENDANT]: Thank you. We object because she didn't let him finish his answer.
 BY THE COURT: All right.
 BY [ATTORNEY FOR STATE]: I apologize profusely. Please continue.
 BY THE COURT: All right. Sustained. Have you completed your answer?
 BY THE WITNESS: No, sir.
 BY THE COURT: All right. You may continue.
 A. The only thing I know is me and Tamika [sic] Land was struggling with a knife. And I was trying not to be cut myself. And I seen her daughter one time, and that's when she told her to go upstairs. Other than that, I didn't have my mind on nobody.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. So Dominique never came downstairs trying to get you off her mama?
 A. She didn't —
 Q. Are you saying you never saw Dominique again?
 BY [ATTORNEY FOR DEFENDANT]: Objection, your Honor.
 A. Yeah, I seen her.
 BY [ATTORNEY FOR DEFENDANT]: She won't let him answer the question.
 BY [ATTORNEY FOR THE STATE]: Okay. I'll ask him again.
 BY THE COURT: He didn't finish the answer, so if you would repeat it.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Are you saying you never saw Dominique Land downstairs again when you were on top of her mama, that she wasn't trying to get you off of her?
 A. I really can't remember, but when I knocked on the door I seen her then.
 Q. Okay.
 A. And as she was coming downstairs, or whenever she opened the door for me, her and her mother, that's when her mother told her to go to sleep, go back to sleep.
 Q. So Dominique could have come downstairs again?
 A. Yes, she could have.
 BY [ATTORNEY FOR DEFENDANT]: That's an improper question, your Honor. It's improper form. You can't ask somebody if they could or couldn't, if someone else could or couldn't have done something. She knows that.
 BY THE COURT: Sustained.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. You don't know if Dominique came downstairs again or not, do you? *Page 64 
 A. I can't remember, ma'am.
 Q. Who stabbed Dominique in her eye?
 A. I don't know, ma'am.
 Q. Did her own mama stab her in the eye?
 BY [ATTORNEY FOR DEFENDANT]: That's asked and answered, Judge. This is the third time she's asked how did Dominique get stabbed in the eye.
 BY THE COURT: Sustained.
 BY [ATTORNEY FOR THE STATE]: I'm sorry.
 BY THE COURT: He said he didn't know. Move on.
 BY [ATTORNEY FOR THE STATE]: (Continuing)
 Q. Did you see her own mother stab her child in her eye?
 A. No, ma'am.
 Q. Did you see Dominique put a knife in her own eye?
 A. No, ma'am.
 Q. Now, you said that this tussle ensued and then you ran out the door and Tamika ran — I'm sorry. I'm calling her Tamika because you do. Tikeshia —
 BY [ATTORNEY FOR DEFENDANT]: Excuse me, your Honor. That's editorial commenting by the prosecutor —
 BY [ATTORNEY FOR THE STATE]: Your Honor, I —
 BY [ATTORNEY FOR DEFENDANT]: Explaining to the jury why she's saying the things she's saying.
 BY THE COURT: Well, that was a natural thing.
 BY [ATTORNEY FOR DEFENDANT]: That's improper.
 BY [ATTORNEY FOR THE STATE]: Your Honor, if I could get through this.
 BY [ATTORNEY FOR DEFENDANT]: She can't get through it improperly. We object.
 BY THE COURT: Well, it was a natural mistake. Overruled.
 BY [ATTORNEY FOR THE STATE]: Thank you.
 ¶ 9. Whitehead cites several cases to support his argument that the cumulative effect of trial court errors can amount to a denial of a fair trial. We agree that in some instances reversible error can occur. However, we do not find the singular errors in this case comparable to the errors in the cases cited by Whitehead. Nevertheless, for completeness, we briefly discuss each of them.
 ¶ 10. Whitehead first cites Brooks v. State,903 So.2d 691, 700(K 36) (Miss. 2005), in which the Mississippi Supreme Court reversed a defendant's murder conviction after concluding, among other things, that he was denied his constitutional right to have counsel present at a lineup from which he was selected.[3] Next, Whitehead cites Stringerv. State, 500 So.2d 928, 930 (Miss. 1986), in which the Mississippi Supreme Court vacated and remanded the death penalty "because the prosecution improperly influenced the jury during the sentencing phase." The court noted that no single action was egregious enough to warrant reversal; however, reversal was proper when the acts were considered in the aggregate.[4] Id. at 930-31. *Page 65 
 ¶ 11. Finally, Whitehead cites Randall v. State,806 So.2d 185, 234-35 (¶ 144) (Miss. 2001), where the Mississippi Supreme Court reversed a capital murder conviction based on cumulative errors that occurred during the penalty phase of the trial. The defendant in Randall, along with four others, was indicted for capital murder; three of the co-indictees agreed to testify against Randall and the fourth indictee was convicted and sentenced to life in prison.Id. at 193-94 (¶ 4). Randall argued that the trial court improperly allowed the prosecutor to repeatedly inform the jury that his co-indictee had been convicted by a separate jury on the same capital murder charge. Id.
at 194 (¶ 6). The supreme court found that the admission of testimony of a witness for the State which showed that the fourth co-defendant had been convicted by a separate jury on the same capital murder charge violated Randall's right to a fair trial. Id. Clearly, the prosecutor's conduct in this case does not rise to the level of misconduct inRandall.
 ¶ 12. Whitehead also argues that he was "irredeemably robbed" of his right to a fair trial due to the following statements made by the prosecutor during her closing argument: "Now, you know, if you can figure — I want ya'll to go back there. If ya'll can figure out a way this woman managed to stab herself 25 times, please acquit him and let him go today." In addition, Whitehead alleges misconduct in the prosecutor's characterization of him as a coward. The prosecutor stated, "He admitted he's a liar. He admitted he's a coward. He fled. He was scared." Defense counsel objected and the trial court sustained the objection. Whitehead contends that this alleged prosecutorial misconduct is analogous to the conduct inBridgeforth v. State, 498 So.2d 796 (Miss. 1986), where the Mississippi Supreme Court reversed a defendant's armed robbery conviction and sentence of life imprisonment. However, we find Bridgeforth distinguishable because Bridgeforth's conviction and sentence were reversed due to the prosecutor's remarks about Bridgeforth's failure to testify, which is clearly prohibited. Additionally, the court noted that the following statement made by the prosecutor was improper: "If I thought I could stand on my head and that would convince you to get this scum off the street, I'd do it." Id.
at 801.
 ¶ 13. Whitehead further contends that the prosecutor committed misconduct in stating that "[y]ou have absolutely no testimony from anyone that Ms. Land ever had any kind of weapon in her hand." Whitehead argues that this statement is false because he testified that Tikeshia had a weapon in her hand at the time of the incident. Defense counsel objected, and the trial court sustained the objection and directed the jury to disregard the statement. *Page 66 
Further, Whitehead argues that the prosecutor improperly stated that "[Andrea Howard] didn't want to be here," when Howard did not testify to that fact.[5] Defense counsel objected, and again the trial court sustained the objection and instructed the jury to disregard the prosecutor's statement.
 ¶ 14. While we concede that the prosecutor was overzealous in her representation of the State, we fail to see how Whitehead suffered any prejudice. Several witnesses, in addition to Tikeshia and Dominique, testified that Whitehead was the person they saw chase and stab Tikeshia, and Dominique's testimony alone is sufficient to support Whitehead's conviction for stabbing her. Thus, there is substantial evidence to support Whitehead's convictions. We cannot say that the prosecutor's overzealousness impacted the jury's verdict.
 ¶ 15. Finally, Whitehead argues that the prosecutor completely disregarded case law when she concluded her closing argument by stating, "You now, the 12 of you, will get to decide if we're going to give protection to women and children in Hinds County against people — ." Defense counsel objected and moved for a mistrial. The trial court sustained the objection, but denied the motion. Whitehead contends that trial court erred in denying his motion because the prosecutor made a "send a message" argument, which is prohibited by the law of this state.
 ¶ 16. Whitehead cites Pay ton v. State785 So.2d 267 (Miss. 1999) to support his argument that the prosecutor committed reversible error. In Payton, the Mississippi Supreme Court reversed a defendant's armed robbery, kidnapping, and arson convictions. Id. at 273(1120). The prosecutor made the following statement during his closing argument: "Send a message to these older, more mature, criminals, `[w]e are not going to let you ruin young people's lives like you have ruined these three people's lives, and all these lives you endangered in the process.'" Id.
at 270 (¶ 9).
 ¶ 17. Although the Payton court refused to adopt a per se reversible error rule, it held that "the use of the `send a message' argument may, depending upon the surrounding circumstances, constitute reversible error on its own."Id. at 271 (¶ 14). The Payton court stated, "Standing alone, the district attorney's use of the `send a message' argument in this case would be reversible error because of the prejudice against Payton evidenced by his more severe sentence." Id. at 272 (¶ 15). Payton and his codefendant were tried for the same crimes; however, the district attorney used a "send a message" argument toward Payton, while asking for leniency for Payton's codefendant.Id. at 270 (¶ 8). The jury returned a guilty verdict and Payton received two life sentences. Id.
at 269 (¶ 3).
 ¶ 18. In Spicer v. State, 921 So.2d 292, 318(1155) (Miss. 2006), the Mississippi Supreme Court held that in order to find reversible error in a prosecutorial comment, the court must determine "(1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights."
 ¶ 19. While we agree that the prosecutor's statement constituted a "send a message" argument and therefore was clearly improper, we find that the remarks did not prejudicially affect Whitehead's right to a fair trial, because the evidence of Whitehead's guilt is overwhelming. Thus, the prosecutor's statement does not warrant reversal. *Page 67 
2. Rulings on Objections and Denial of Motion forMistrial
 ¶ 20. In this assignment of error, Whitehead contends that the trial court allowed the State to improperly impeach one of its witnesses, Andrea Howard, and that the State failed to show that the impeachment was related to a relevant issue. According to Whitehead, the State was required to show surprise or hostility prior to impeaching its witness. In support of his argument, Whitehead cites Wilkins v. State,603 So.2d 309, 322 (Miss. 1992), in which the Mississippi Supreme Court stated, "before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence."
 ¶ 21. Based on Wilkins, we agree that the State was required to show surprise prior to impeaching its witness. Our review of the record reveals that the State made no showing of surprise prior to attempting to impeach Howard and that Howard had not demonstrated any hostility at that point. Therefore, we agree with Whitehead that the State used an improper impeachment procedure. Nevertheless, we find that allowing the employed procedure constituted harmless error, because the matter which was the subject of the impeachment involved the location of the car that Whitehead drove to the scene of the altercation.
 ¶ 22. Whitehead cites Flowers v. State,773 So.2d 309 (Miss. 2000) for the proposition that the State was also required to offer proof that the inconsistent statement was relevant to an issue in the case. In Flowers, the court stated, "Then with the predicate properly laid, the witness may be impeached by showing prior statements inconsistent with the in-court testimony, so long as the statement made in court is one relevant to the issue in the case and therefore not collateral." Id. at 326(1157) (quoting Carlisle v. State, 348 So.2d 765, 766
(Miss. 1977)). As we have already noted, the State's impeachment of Howard concerned the location of the vehicle that Whitehead had driven to the complex prior to the commission of the crime. Howard's testimony was clearly relevant since Whitehead left the crime scene in a vehicle driven by her, rather than in the vehicle that he had driven to the complex. We cannot find that Whitehead was improperly prejudiced because the State was entitled to impeach Howard, although it failed to do so in the proper manner.
 ¶ 23. Whitehead also argues that he was denied his right to a fair trial when the prosecutor asked whether his name was also on the automobile certificate of title for the vehicle he shared with Howard. Whitehead contends that this question was asked in an effort to "paint a picture of [him] as worthless and freeloading, thereby prejudicing the jury." Whitehead argues that what happened during his trial is similar to what occurred in Smith v. State, 457 So.2d 327 (Miss. 1984), where the Mississippi Supreme Court reversed the conviction and sentence of a defendant due to several instances in which the district attorney asked questions clearly designed to inflame the jury. For example, during cross-examination of a witness for the defendant, the district attorney asked the witness whether she was selling her body in Jackson, like she had done when she lived on the coast. Id. at 334. The district attorney also impeached a witness's credibility by referring to the witness's omission of a matter in the first trial when he knew that the witness was abiding by a motion in limine. Id. at 335. *Page 68 
 ¶ 24. This Court fails to see how the prosecutor's inquiry regarding whether Whitehead's name was on the certificate of title compares to the inflammatory and prejudicial conduct of the district attorney in Smith. There is no merit to this contention.
 ¶ 25. Next, Whitehead argues that he was prejudiced by the prosecutor asking Howard whether she thought Whitehead "did or did not like cops." We note, at the outset, that the prosecutor did not raise this issue initially and was simply following up on answers given by Howard in the following exchange:
 Q. Okay. And what did he say when he called you on the phone?
 A. He just said come pick him up around the corner, across the street.
 Q. I'm sorry. Where?
 A. He told me to pick him up across the street. He was around the corner.
 Q. Across the street, where would that be?
 A. He was out by the stop sign at the entrance into the apartment.
 Q. Did you find that odd?
 A. Kind of but not really, because I mean, it was police everywhere, and he don't like police so he don't go near them. So I knew he wasn't going to go near police, so I didn't find it odd.
 * * * * Q. Now, whenever you picked up the defendant on the corner at the stop sign because he didn't like being around cops"
 ¶ 26. We fail to see how Whitehead suffered prejudice because of the prosecutor's question. This contention is without merit.
 ¶ 27. Finally, Whitehead argues that the prosecutor improperly continued to use leading questions and to make personal comments to Whitehead's attorney after the trial court had previously sustained his objections to leading questions and commentary. Whitehead relies on Lester v. State,692 So.2d 755, 781 (Miss. 1997) (overruled on other grounds) to support his argument that the prosecutor's actions were "pervasive and poisonous and so fatally tainted [his] trial as to deprive [him] of his right to a fair and impartial trial." In Lester, the defendant was convicted and sentenced to death in the capital murder of his one-year-old daughter.Id. at 765. The Mississippi Supreme Court reversed the defendant's conviction and sentence because "[t]he combined effect of the prosecutor's improper, irrelevant, and prejudicial cross-examination and closing argument was to unfairly prejudice Lester in the eyes of the jury."Id. at 781. The prosecutor questioned the defendant about a previous grand larceny conviction, and "suggested during cross-examination and closing argument that the [defendant] didn't abuse his daughter by Jeanette Shields only because he had not seen her since she was three months old."Id. Specifically, the prosecutor stated, "And he didn't even have a chance at that child, thank God. Because he never even saw it after it was three months old to the child's ever-living glory. That child didn't get abused because he wasn't there long enough." Id.
 ¶ 28. Whitehead directs our attention to the following exchange to support his contention that the prosecutor's personal comments prejudiced him in the eyes of the jury:
 BY [ATTORNEY FOR DEFENDANT]: We're going to object to the leading again, your Honor. *Page 69 
 BY [ATTORNEY FOR THE STATE]: Your Honor, did you know. I don't know how much more than a non leading question could that be.
 BY [ATTORNEY FOR DEFENDANT]: Well, she's giving the answer in the question and she's asking for a yes or no answer. That's about as leading a definition as there is in the Rules of Evidence.
 BY [ATTORNEY FOR THE STATE]: I appreciate the tutorial by [defendant's attorney], but I think I know the Rules of Evidence.
 ¶ 29. This Court cannot agree with Whitehead that the prosecutor's comment in the above quoted exchange was prejudicial to him. Furthermore, we cannot agree that the conduct was comparable to the prosecutor's conduct inLester or in any of the other cases cited by Whitehead. Therefore, we find no reversible error.
 ¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF HINDSCOUNTY OF CONVICTION OF COUNT ONE, AGGRAVATED ASSAULT, ANDCOUNT TWO, AGGRAVATED ASSAULT, AND SENTENCE OF CONSECUTIVETERMS OF TWENTY YEARS ON EACH COUNT, IN THE CUSTODY OF THEMISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTSOF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
[1] Actually, Whitehead lists four issues. However, issues one, three, and four are interrelated, as each alleges a denial of due process and a denial of the right to a fair trial stemming from alleged acts of prosecutorial misconduct. We discuss these issues together. Whitehead's second issue involves the propriety of the trial judge's ruling on certain objections and the denial of Whitehead's motion for a mistrial, also due to alleged misconduct by the prosecutor. Although there is some interplay between this issue and the other three, we discuss this one separately.
[2] Whitehead and Tikeshia had been involved in a sexual relationship for several weeks.
[3] The Mississippi Supreme Court also found that the trial court allowed impermissible hearsay testimony and that the trial court erred in admitting gang-related evidence because the State failed to lay the proper foundation and that the State did not conduct the proper analysis as required by Rule 403 of the Mississippi Rules of Evidence. Id.
[4] The Stringer court found the following errors sufficient to warrant reversal:
 (1) The introduction into evidence of photographs of the body of Nell McWilliams. (Note that Jimbo Stringer was previously convicted of the murder of Nell McWilliams. Stringer v. State, 491 So.2d 837
(Miss. 1986). This appeal stems from his trial for the murder of Ray McWilliams).
 (2) The display to the jury, during closing argument, of color slides of the body of Nell McWilliams.
 (3) The State's attempt to prevent Stringer from calling John Mack Parker as a witness
 (4) The prosecutor's questioning during voir dire, to get a commitment from the jury to exclude certain mitigating factors from its consideration of the death penalty and his subsequent reminder to the jury of that promise, under oath, during closing argument.
 (5) The "last chance" argument, to influence the jury to return the death penalty for the killing of Mrs. McWilliams.
 (6) The prosecution's comment on Stringer's failure to testify.
Stringer, 500 So.2d at 930-31.
[5] Howard was Whitehead's girlfriend at the time of the incident.