**UNITED STATES of America, Appellee,**

v.

**Vincent DeLILLO, David Francis and Clearview Concrete Products Corporation, Appellants.**

**Nos. 497 to 499, Dockets 79–1327, 79–1341 and 79–1342.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1980.

Decided May 8, 1980.

John K. Villa, Washington, D. C. (Williams & Connolly, Raymond W. Bergan, and Bruce R. Genderson, Washington, D. C., of counsel), for defendants-appellants Vincent DeLillo and Clearview Concrete Products Corporation.

James M. Catterson, Jr., Port Jefferson, N. Y. (Catterson & Nolan, Port Jefferson, N. Y., of counsel), for defendant-appellant David Francis.

Edward R. Korman, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y. (Thomas P. Puccio, Attorney-in-Charge, Organized Crime Strike Force, Eastern District of New York, Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before LUMBARD, MOORE and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Three defendants appeal from their convictions, after a jury trial before Judge George C. Pratt in the Eastern District, for conspiracy from June 10, 1974 to June 26, 1978 to defraud the United States in violation of 18 U.S.C. § 371 in the construction of a federally funded sewer project in the southwestern portion of Suffolk County. The corporate appellant, Clearview Concrete Products Corporation ("Clearview"), was a major contractor and supplier of concrete pipe for the project; appellant Vincent DeLillo was chief operating officer of Clearview during the period in which the alleged fraud occurred, and appellant David Francis was a longtime employee of Clearview. The three appellants claim that various rulings by the trial judge entitle them to a reversal. We find no error in the conduct of the trial and affirm all three convictions.

Clearview, founded, owned and controlled by members of the DeLillo family, contracted with Lizza Industries, Inc., to supply approximately 97% of the concrete pipe needed for construction of the Suffolk County Southwest Sewer District Project, at a cost of approximately $20 million. Although they conceded at trial that Clearview engaged in numerous acts of fraud, including the conducting of rigged tests of the pipe it manufactured, the bribery of inspectors hired by consulting engineers, and the improper repair of pipes previously installed, the defendants argued that the frauds were committed at the instigation and under the supervision of Walter Gorman, a Clearview employee from June 1974 to November 1976, without the knowledge or cooperation of Vincent DeLillo or David Francis. Gorman testified as the government's chief witness at trial.

Because there is no claim that the evidence was insufficient, a restricted summary of the facts will suffice. The fraudulent conduct in which Clearview engaged included the systematic rigging of hydrostatic and three-edge bearing testing of concrete pipe made by Clearview. There was copious and direct evidence, some gathered during a raid by F.B.I. agents at an actual test on June 26, 1978, that a three-edge bearing machine put together by Clearview and operated on Clearview's premises included the addition of a yellow valve, by which the actual amount of pressure being applied to the pipe under examination could be reduced without any reduction in the reading on the gauges visible to the inspectors. Defendant Francis was detailed to operate the yellow valve in this manner and other Clearview employees were ordered to position their bodies during the tests in such a way as to block the inspectors' view of the yellow valve.

A second aspect of the defendants' conspiracy was the outright bribery of several inspectors. Gorman testified that Vincent DeLillo told him how much he, Gorman, was to pay out on Clearview's behalf to the inspectors. Thomas Monahan, a Clearview employee, corroborated Gorman's testimony in key respects on this issue, and some of the inspectors admitted accepting cash payments.

The third part of the conspiracy involved Clearview's efforts to conceal the results of its earlier misconduct. Having gotten the substandard pipe past the barrier of inspection, Clearview began to get reports, after installation, that major cracks were appearing in the pipe. Vincent DeLillo sent Clearview workmen to the scene to perform woefully inadequate, cosmetic "repairs". These repairs were performed surreptitiously— that is, Clearview gave no notice to county officials, and, with the connivance of the

contractor, Lizza Industries, the repairs were concealed from project inspectors.

On appeal, defendants Vincent DeLillo and Clearview press three grounds, each of which, they argue, constitute reversible error: First, the admission into evidence for impeachment purposes of testimony by Gorman that Andrew DeLillo, Vincent DeLillo's father, threatened both him and Monahan with retribution should either testify in a manner incriminating to Vincent DeLillo; second, the admission of redacted portions of a tape recording of testimony Monahan gave to the grand jury, for the purpose of impeaching portions of Monahan's testimony at trial; and third, the trial judge's failure to give the jury any instruction on the relation, if any, between the surreptitious nature of the in situ repairs to Clearview's contractual obligations. David Francis raises several other issues: the allegedly incorrect ruling by the trial judge forbidding the demonstration of the three-edge bearing machine in the presence of the jury; the ruling by the trial judge that Francis' counsel's cross-examination of Gorman as to Gorman's prior bad acts could not extend to challenging Gorman's initial answers to such questions; the denial by the trial judge of two motions involving jury selection; and, finally, an alleged variance between the indictment and the proof adduced by the government at trial.

■ First, we address the question of the admission of Gorman's testimony about Andrew DeLillo's threat.[1] Initially, it may be noted that Andrew DeLillo was not indicted and did not testify. He was Clearview's founder and controlled it, although ownership had been dispersed among various members of the DeLillo family. In 1974, Andrew, because of ill-health, had turned over the presidency of the company to his son, Vincent, then twenty-two years old. Andrew resumed the reins after the F.B.I. "raid" on June 26, 1978.

We have already noted that Monahan (a Clearview employee who was a brother-in-law of Andrew DeLillo), also testified for the government, corroborating Gorman's testimony in important respects. But in some details Monahan's testimony differed from Gorman's and a pattern in these differences emerged—Monahan avoided implicating Vincent DeLillo in Clearview's illegal behavior. As the trial judge summed up the situation: "Monahan's testimony could have been viewed as having been carefully structured to insulate Vincent DeLillo from any involvement in the conspiracy."

The sequence of events immediately prior to the introduction of the threat evidence was as follows: After both Gorman and Monahan had testified on direct and cross-examination without mentioning the conversation in Andrew DeLillo's car in which the threat was made, the government recalled Monahan, who testified, among other things, that he had lied when he implicated Vincent DeLillo in the course of a tape-recorded conversation with Gorman which had been played to the jury. Monahan maintained that other portions of this conversation, damaging to Clearview but not to Vincent DeLillo, were true. The prosecutor then asked Monahan about a conversation with Andrew DeLillo in the latter's car, at which Gorman (along with Andrew DeLillo's chauffeur Vincent Fradella) had also been present. Monahan gave an account which did not include any testimony of a threat uttered by Andrew DeLillo. The government then recalled Gorman and asked him, again among other things, to give his account of the conversation with Andrew DeLillo. Gorman's version tracked Monahan's but included in addition testimony that Andrew DeLillo said "[t]hat whoever this guy [the F.B.I. informant] is, if he hurts my son he will be looking over his shoulder for the rest of his life." The defense objected to Monahan's testimony about the conversation and in its post-trial

---

1. Our analysis of the threat evidence in this case applies to the introduction of testimony of Andrew DeLillo's threat as it affected the case against Vincent DeLillo. Insofar as the threat came in against Clearview, of which Andrew

DeLillo was president at the time the threat was made, the district court's ruling allowing the threat to come in as substantive evidence has not been challenged.

motion for a new trial urged that admission of the threat was so prejudicial that it should have been excluded under Rule 403 of the Federal Rules of Evidence.

Judge Pratt, in his post-trial memorandum denying the new trial motion, gave us an explicit account of his retrospective performance of the balancing required by Fed. R.Evid. 403, which reads in pertinent part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .

We think there was no error in admitting Gorman's testimony regarding Andrew De-Lillo's threat.

Appellants argue that our prior cases establish a principle that threat evidence cannot be introduced by the government except under "exceptional circumstances", which can be characterized as fair response to affirmative actions by the defense which "invite introduction of the threat evidence," *United States v. Malizia*, 503 F.2d 578, 581 (2d Cir. 1974). It is true that the fact patterns of some of our cases in this area fit this characterization. However, at no point has this Circuit ever held that the normal processes of Fed.R.Evid. 403 balancing must be supplemented by an additional, iron-clad requirement that the defense "invite" threat testimony.

In our most recent case, *United States v. Check*, 582 F.2d 668 (2d Cir. 1978), in which we reversed a narcotics conviction, the entire discussion of threat evidence is described by the panel itself as dicta. 582 F.2d at 684–85. *Check* reviews prior cases and notes that in each of them "the government, in eliciting death threat testimony, was responding to an issue already broached by the defendant . . ."; and *Check* pointed out that "[t]he problem with the government's position in this regard is that the record clearly demonstrates that the government was not, in fact, *responding* to a previously raised defense argument . . . .". 581 F.2d at 685–86. In any event, *Check's* reasoning is inapplicable to the case at bar because of three additional facts present in *Check* and not present here.

First, the death threat in *Check* was not a specific threat directed at a witness, whose introduction would thus serve the purpose of explaining a conflict in testimony. What the defendant said in *Check* was "that if he had any problems with anyone he wouldn't hesitate to shoot them." How this statement was expected to bolster the credibility of the witness who offered the testimony, an undercover police agent, is unclear from the opinion in *Check*; presumably an undercover narcotics agent would not realize for the first time that his life was in danger when confronted with a statement of this kind reproduced above, and presumably such an agent would be less likely to alter his testimony in response to such a threat than an ordinary citizen. Moreover, the threat in *Check* was a generalized threat; a statement of the defendant's willingness to shoot anyone who crossed him, not focused on anyone in particular or on the fact that the recipient of the threat might testify in court. The generality of the *Check* threat counts against its usefulness in bolstering credibility and makes it more prejudicial in its possible effects on the jury. Second, the threat in *Check* was made by the defendant. In the case at bar the threat was not made by a defendant; since this circumstance distinguishes the case at bar from almost all our precedents, we will deal with it after our discussion of the cases. Third, the prosecutor in *Check* announced his intention to introduce the death threat in his opening statement, thus supporting the view that its introduction as a means of bolstering the credibility of the agent was a pretext.

Another recent case relied on by appellants is *United States v. Malizia*, 503 F.2d 578 (2d Cir. 1974). *Malizia* did not involve a threat directed toward a witness whose credibility was in question, because the reason the government sought to introduce evidence of death threats in *Malizia* was to explain the absence of one of its informants. As in *Check*, the actual threat involved was quite vague; all the government proffered was the hearsay testimony that the informant was in fear for his life. Most important of all, in the case at bar the

recipient of the threat, Monahan, was testifying on the stand and available for cross-examination as to whether or not the threat had been communicated to him and with what effect. (Indeed, the person who made the threat, Andrew DeLillo, was present in court throughout the trial and could have been called). In *Malizia*, neither the recipient of the threat, nor the unidentified issuer of the threat, was available for cross-examination.

In *United States v. Rivera*, 513 F.2d 519 (2d Cir. 1975), the government was permitted to adduce proof that "unnamed third parties" threatened the life of a witness, in order to explain differences between his grand jury and trial testimony. This case is of particular interest since it conforms to the appellants' model of defense invitation (". . . a claim, vigorously developed by defense counsel in cross-examining [the government witness] . . .") and unlike the other cases discussed, does not involve a threat by the defendant. However, the trial court's admission of the threat testimony was affirmed in *Rivera,* and there is no language in the opinion to suggest that the circumstance of defense invitation was intended by the Rivera court to function as a *limit* on the acceptability of threat evidence in other cases.

In *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976), we sustained the admission of evidence of a death threat where the defense cross-examined a government witness in such a way as to evince from her mention of a death threat. Although *Panebianco* would present no exception to the rule proposed by appellants in this case, it does not purport to set out the limits of the circumstances under which the government may be permitted to introduce death threat evidence. Like all our decisions in this area, it focuses upon the existence of confusing or contradictory testimony by a government witness which the government can explain if it is allowed to introduce evidence of threat. Moreover, the threat at issue in *Panebianco* was one made by the defendant.

In *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir.), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1972), we found no error in the admission of the testimony of a government witness that the defendant had threatened to kill him after cross-examination by the defense had established that his trial testimony differed from what he had told a grand jury. This court affirmed on the broad ground that an "impeached witness may always endeavor to explain away the effect of [a] supposed inconsistency by relating whatever circumstances would naturally remove it." (quoting 3A Wigmore, *Evidence* § 1044 (1970)).

In *United States v. Briggs*, 457 F.2d 908 (2d Cir. 1972), we have an example of a case which falls outside the overly narrow rule appellants would have us adopt. In *Briggs,* the defendant denied having made death threats against a government witness, in response to questions put by the government on cross-examination. Despite the apparent absence of any defense "invitation", the trial judge allowed the agent to testify that the defendant had indeed threatened his life. We affirmed without any mention of a requirement that the defense do anything at all to trigger the government's ability to introduce threat testimony.

The question posed by the unusual fact pattern in the case at bar, then, reduces itself to whether or not the posture of testimony to the time the government sought to introduce evidence of Andrew DeLillo's threat was tantamount to impeachment of a witness. *See United States v. Cirillo*, 468 F.2d at 1240. We conclude that it was. The government's right to introduce threat evidence is not a matter that turns on the conduct of the defense. To allow it to do so would mean that the defense could, by taking no action, profit from a contradiction in testimony between two government witnesses testifying on direct or redirect, as happened here. We can see no justification for such a restriction. *See United States v. Malizia*, 503 F.2d at 581 (quoting *Schumacher v. United States*, 216 F.2d 780, 788 (8th Cir. 1954),

*cert. denied*, 348 U.S. 951, 75 S.Ct. 439, 99 L.Ed. 743 (1955)). If a credibility issue becomes apparent to the jury, the government should be afforded the opportunity to resolve it through the use of threat testimony—subject, of course, to the usual operation of the balancing test mandated by Fed.R.Evid. 403, to which we now turn.

 All of our cases decided since the adoption of the Federal Rules of Evidence recognize that the central issue when threat testimony is sought to be introduced is the balance of probativeness and prejudice required by Fed.R.Evid. 403. The importance of our concern with the government's need to introduce evidence of threats in order to help the jury resolve a credibility issue is a reflection of the fact that one element of this balance is probativeness. Of course, the balance between probativeness and prejudice will differ according to the purposes for which a piece of evidence is to be admitted. A death threat may be of very strong probativeness when it is directed against a witness and what is sought to be proved is that the witness' testimony was affected by it; and the prejudice is likely to be small because the jury will be instructed not to consider the threat on the question of the defendant's overall guilt. The prejudice is further reduced when, as in this case, the person who made the threat is not a defendant. There is a set of factors—the purpose for which the threat is sought to be admitted, the identity of the person making the threat—that a judge balancing under Fed.R.Evid. 403 must consider (although we do not mean these examples to be exclusive). We can say, and so hold, that the circumstances of which side makes what arguments and whose witnesses are involved, are irrelevant to this balancing, except insofar as they overlap with one of the factors mentioned above.

We turn now to the second major argument of appellants DeLillo and Clearview. Gorman's testimony included a statement by Vincent DeLillo that DeLillo did not care what had to be done to stop the pipes to be tested from leaking. Monahan's testimony about the conversation tracked Gorman's account but he denied that DeLillo said that he did not care what had to be done to achieve the desired result. The government then sought to introduce a tape recording of a conversation between Monahan and Gorman in which Monahan confirmed Gorman's version of DeLillo's statement. The trial judge admitted a redaction of the tape recording limited to Monahan's confirmation of Gorman's account of DeLillo's orders, after performing a Fed.R.Evid. 403 balancing with regard to all the contents of the tape. Of course, what was ultimately admitted by the trial judge was limited in its use by the jury to impeachment purposes.

 Appellants argue that the judge's ruling contradicts the purported rule that the government may not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony. As stated in *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) "[i]mpeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible." *See also United States v. Rogers*, 549 F.2d 490, 497 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). This, however, is the most *Morlang* can be said to stand for.

 Beyond doubt, Monahan was not called to the stand by the government as a subterfuge with the primary aim of getting to the jury a statement impeaching him. Monahan's corroborating testimony was essential in many areas of the government's case. Once there, the government had the right to question him, and to attempt to impeach him, about those aspects of his testimony which conflicted with Gorman's account of the same events. *Morlang* itself explicitly recognizes the propriety of impeachment where it is "necessary to alleviate the harshness of subjecting a party to the mercy of a witness who is recalcitrant or may have been unscrupulously tampered with." 531 F.2d at 190. To the extent that defendants rely on *Morlang* for the principle that a witness cannot be put

on the stand if the side calling him knows that he will give testimony that it will have to impeach, it seems clear to us that the effect of Fed.R.Evid. 607, codifying the right to impeach one's own witnesses without special restriction, is to nullify the plausibility of such a reading. The *Morlang* opinion itself recognizes that enactment of Fed.R.Evid. 607 might have such an effect. 513 F.2d at 189–90.

Appellants also argue that, *Morlang* aside, a proper balancing of prejudice and probativeness under Fed.R.Evid. 403 should have resulted in exclusion of the tape recording by the trial judge. Appellants argue that since evidence which, once introduced, can be used only for impeachment purposes cannot of itself contribute towards the proof of anything, the use of the tape recording could be assigned no probative value. This analysis neglects the fact that Monahan testified on many issues. The jury would have been justified in using the impeachment evidence with regard to Andrew DeLillo's conversation with Monahan and Gorman as an element in evaluating Monahan's overall credibility. Thus, introduction of the tape recording had probative value in that it may have enabled the jury to resolve conflicts in credibility with respect to other issues on which Monahan testified.

Any prejudice to Vincent DeLillo traceable to introduction of the tape recording must be considered minimal, since the evidence came in with a limiting instruction which, it must be assumed, was followed by the jury. *United States v. Briggs, supra* at 910. Moreover, appellants do not argue that there was any question as to whether or not Monahan actually made the statement sought to be introduced. Instead, they argue that he was intoxicated at the time and thus that the statement was unreliable. That, of course, goes to the weight to be given to the statement and not its prejudicial effect. Additionally, we note

that any possibility of undue prejudice [2] could have been offset by defense cross-examination of Monahan.

Finally, DeLillo and Clearview argue that the trial judge's failure to charge the jury as to the lack of any contractual obligation on Clearview's part to notify the authorities of repair was reversible error. We disagree. The government did not argue that the surreptitious manner in which Clearview's in situ repairs on the pipes were carried out violated Clearview's contract, nor did the government argue that had the contract been violated such violation would be a basis for finding the defendants guilty. The government simply argued that the manner in which the "repairs" were performed was contrary to industry practice and was evidence of the defendant's criminal intent. Under such circumstances, there was no need for the judge to instruct the jury that Clearview's contract did not require it to give notice of in situ repairs.

We come now to a series of points raised on appeal by defendant David Francis. None of these have merit. First, Francis argues that it was error for the trial judge to deny him an opportunity to demonstrate the operation of the three-edge bearing apparatus in the presence of the jury. But the discretion committed to the trial judge in supervising jury-viewed demonstrations is broad, and in this case Francis' attorney at trial did not object to the performance of the test outside the presence of the jury. Francis' expert, moreover, was allowed to testify about the results of his operation of the machine outside the jury's presence, and Francis has advanced no serious argument that the judge's ruling on this matter prejudiced him.

Second, Francis argues that the trial judge erred in ruling that although his lawyer could ask Gorman questions about Gorman's prior bad acts, Gorman's answers

---

**2.** The prejudice resulting to defendants from the fact that introduction of the evidence was damaging to their case is, of course, not the kind of prejudice against which Fed.R.Evid. 403

protects defendants. *United States v. Briggs*, 457 F.2d 910; *United States v. Cirillo*, 468 F.2d at 1240.

were not subject to a secondary level of impeachment. Rule 608(b) of the Federal Rules of Evidence commits the decision to impose such a limit on bad act impeachment to the discretion of the trial judge, which we decline to overrule.

Third, Francis argues that the district court erred in rejecting his blanket challenge to all potential jurors who lived in the geographical area to be served by the Suffolk County Southwest Sewer District—an area embracing 20% of the county's population. In light of the trial judge's entirely proper handling of the question of preconceived juror opinions on the case, there was no abuse of discretion in his denial of Francis' motion.

Finally, Francis argues that a fatal variance arose between his indictment, which charged that a single conspiracy to defraud the United States had been carried out by defendants, and the proof adduced by the government at trial, which—Francis claims—showed the existence of multiple conspiracies. Francis' involvement in the conspiracy was limited, as the prosecutor conceded in his closing statement, to knowing participation in the rigging of concrete pipe tests. But it is well-settled that when "a conspiracy had multiple objectives, a conviction will be upheld so long as evidence is sufficient to show that appellant agreed to accomplish at least one of the criminal objectives." *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). The government presented overwhelming proof at trial of a conspiracy directed towards the systematic defrauding of the United States through the improper production and testing of concrete pipe, aided by the bribery of inspectors and the performance of repairs meant to conceal rather than correct. There was abundant evidence that Francis participated in the fraudulent testing and thus his variance argument has no force.

The convictions are affirmed.