FAIR, J.,
for the Court:
¶ 1. Rundall James was convicted of murdering his great aunt, Zelphia Ivory, by pouring hot cooking oil on her as she slept. Ivory died before she could give a statement to the authorities. The State built a case against James showing that he had threatened to “burn” Ivory for making his dog sick and that he had been in the house a short time before the attack. However, the State’s key witnesses— James’s brother and his girlfriend — suggested James had left before the attack and testified that Ivory could not identify her attacker. The prosecution then impeached its own witnesses with unsworn prior statements that James had been identified as the assailant and that he was seen outside the house shortly after the attack.
¶ 2. We find that the impeachment was improper without the required predicate of surprise or unexpected hostility. We also conclude the error was prejudicial enough to deny James a fair trial, and we there *696 fore reverse James’s conviction and remand for a new trial.
FACTS
¶ 3. In September 2009, Rundall James and his brother Zaeherius James (“Zach”) were living with Ivory, their great aunt, at her home in Mound Bayou. Ivory was ninety-five years of age, and over the years she had allowed many family members to stay in her home.
¶ 4. James allegedly came to believe Ivory had sickened his Rottweiler by feeding it table scraps. The dog ended up at the vet and may or may not have died. James was upset and demanded that Ivory pay for the dog and its veterinary expenses, but she was unable or unwilling to do so. This made James angrier, and multiple witnesses testified that in the weeks before her attack he had alternatively threatened to kill her, burn her house down, or “burn” her if she did not compensate him for the dog. Ivory made a report to the police about James approximately one week before the attack. The day before the attack James apparently waited for Ivory at the Senior Citizen Complex in Cleveland, Mississippi. Ivory appeared to be afraid of James and refused to go with him when he insisted. James repeatedly said: “You know what you’re supposed to be doing. You’re going with me.” James eventually relented and left.
¶ 5. Sometime after midnight Zach and his girlfriend, Samantha Jackson, returned to Ivory’s home. Zach was drunk, but Samantha had had only one drink. Zach had forgotten his key to the house, so he had to knock on Ivory’s window for her to let them in. They, along with two of Zach’s small children, retired to one of the bedrooms.
¶ 6. Lewon Payne testified that he and James had spent the evening at a high school football game. They went drinking afterwards, and when they got back to the Payne home, James was drunk. James wanted to sleep there, but he apparently was not ready to call it a night, so Crystal James — James’s sister and Payne’s then-wife — insisted Payne take James home. Payne complied, dropping James off at Ivory’s house between 2:00 and 8:00 a.m.
¶ 7. Samantha and Zach testified that sometime after they went to bed, James came into the house. He knocked on the door to their bedroom and asked for a cigarette. Zach awoke but did not respond; Samantha told James they did not have one. James then told Samantha he was going to his cousin’s house, and he closed the door. Three to five minutes later, Samantha saw a shadow move past the doorway, and a few minutes after that she smelled grease and heard cracking sounds. Then a shadow came back and forth across the doorway again, and she heard Ivory scream. Both Samantha and Zach got out of bed and rushed to Ivory’s bedroom, where they found her covered in grease. According to Samantha, she said, “I’m burning. He came through the window. Dear Lord, why am I burning so bad?” Zach testified Ivory told him someone had tried to come in through the window, but he found all the windows closed and locked. The front door, however, was either cracked open or “wide open,” depending on the testimony. Zach got dressed, retrieved a pistol, and went outside where he saw a man he described as “[n]o one in particular. Tall male, brown skin.” Zach initially “just assumed” the man was James because he appeared to be walking toward the house, but when Zach came out the man veered away. Zach denied the man looked like his brother. At some point, Zach fired a shot, though it is unclear from his testimony whether he was trying to shoot the man or just frighten him away. Zach and Samantha called *697 the authorities and various family members. Diane James (Zach and James’s mother) arrived before the ambulance. She testified for the defense that Ivory said she did not know who had burned her.
¶ 8. Ivory suffered second- and third-degree burns to approximately forty percent of her body. She was taken by ambulance to the Bolivar County Medical Center and shortly thereafter flown to a burn center in Augusta, Georgia. She died of sepsis about one week after the attack. Ivory was sedated and intubated during her treatment and was never able to speak to the authorities.
¶ 9. The -prosecutor repeatedly questioned Samantha and Zach about prior statements they had made to investigators. The duo denied critical assertions supporting the prosecution’s case that were never established with admissible substantive evidence: that they would have heard James leave if he had left the house before the attack, that Ivory had identified James as the assailant, and that James was seen outside the house immediately afterwards. The prosecutor also sought to impeach their testimony on other critical points, including: whether and to what degree James was angry with Ivory over the dog, whether he had threatened her, and how many people had a key to the house. Zach and Samantha denied many of the alleged prior statements.
¶ 10. The State then called Investigator Charles Griffin, who testified to prior statements by both witnesses. The State also introduced and played for the jury a tape recording of Griffin’s interview with Zach that confirmed the investigator’s account of what Zach had said. Another investigator testified Zach had given him a similar statement about a year after the first interview. The State also called Le-won Payne, James and Zach’s former brother-in-law, who testified that Zach had, in a teary confession, told him Ivory identified James as her attacker. Zach also told Payne it was James he had fired upon outside the house. Payne described Zach as wracked with guilt for shooting at his brother and for implicating him to the authorities. Several times during the trial, the judge admonished the jury that it could not consider the impeachment as substantive evidence.
¶ 11. Zach and Samantha either denied making the prior statements or attempted to explain them. When confronted with his prior statement to Investigator Griffin, Zach testified he had not told the truth. He explained that after the attack, he and Samantha were arrested for the crime and booked into the Bolivar County Jail. Zach was told they would not be released until he gave a statement implicating James, who he was told had already confessed. Zach also claimed to have been threatened with' prosecution for “buying too many guns” if he did not implicate his brother.
¶ 12. The jury convicted James of murder and he was sentenced to life imprisonment. James appeals from that judgment.
DISCUSSION
¶ 13. James raises several issues on appeal, but we find one dispositive: whether the circuit court erred in permitting the State to impeach its own witnesses without first showing surprise or unexpected hostility. Because this error requires a new trial, we will not address the other issues presented in James’s brief.
¶ 14. The leading Mississippi case on this issue is Wilkins v. State, 603 So.2d 309 (Miss.1992). Our supreme court had promulgated the Mississippi Rules of Evidence some years before, in 1985, and in Wilkins the court addressed whether Rule 607 changed the pre-rules practice of allowing a party to impeach its own witness *698 only if it was surprised by his testimony at trial. Rule 607 provides: “The credibility of a witness may be attacked by any party, including the party calling him.” The court considered the conflict between the apparent broadness of Rule 607 and other rules of evidence prohibiting hearsay, as well as the danger of a defendant being convicted based on testimony that was supposed to have been considered only for impeachment. See Wilkins, 603 So.2d at 818-22. The decision was unanimous in result, and eight of the nine justices agreed on an opinion authored by Justice Hawkins.
¶ 15. Our supreme court recognized that most other courts considering their analogues of Rule 607 had not explicitly required surprise or unexpected hostility. See id. at 321. However, in the supreme court’s view, they had achieved essentially the same result with a different justification: other courts forbid a party from using a prior inconsistent statement “under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible.” See id.[1] The Wilkins court found this impractical because of its subjectivity, as well as unnecessary: “The trouble with this rationale is first ... it makes admissibility of evidence depend on what is in the attorney’s head, a rather difficult undertaking; and second, if there is in fact no surprise, the only possible motive for attempting to impeach one’s own witness is to get otherwise inadmissible testimony into evidence.” Id. (citation omitted). The court concluded that a bright-line rule requiring a showing of surprise or unexpected hostility was the better course, expressly rejecting exclusion only in the case of prose-cutorial subterfuge, an improper purpose, or the like. Id. Wilkins has been reaffirmed by the Mississippi Supreme Court as recently as 2011. See Osborne v. State, 54 So.3d 841, 845 (¶ 14) (Miss.2011).
¶ 16. In today’s case, the prosecution never claimed surprise or unexpected hostility. However, perhaps because we review a trial court’s decision on the admissibility of evidence for an abuse of discretion, Young v. State, 106 So.3d 775, 777 (¶ 9) (Miss.2012), appellate courts will sometimes search the record for a post-hoc justification for admitting the contested evidence. See, e.g., Wharton v. State, 734 So.2d 985, 986-87 (¶ 7) (Miss.1998). None is forthcoming in this case. Instead, from what we can glean from the record, the prosecution appears to have had good reason to anticipate hostility. Zach and Samantha moved out of state after the attack on Ivory, and the trial had to be continued several times because they could not be found. Even before they testified, the State felt it necessary to have them held in jail to ensure their appearance. Exactly what the prosecutors knew was never disclosed on the record. However, when the trial judge explained his decision to allow the impeachment, he described neither surprise nor unexpected hostility:
The Court did find — although the Court did make a ruling at that time — the Court did find that the testimony of Zacherius James had — his testimony had become hostile to the State, although he was a State’s witness, and, of course, the Court had some background with this case. The Court is aware, and I think several months ago the Court was made aware of the difficulty the State was having securing the attendance of [Zach] as well as Ms. Samantha *699 Jackson, and so the Court was well aware of the potential that those witnesses may — their versions of events may change from those given to the trial, and for that reason, the Court felt that the tape would be admissible for purposes of impeachment, but the Court has taken caution to advise the jury that it’s for use of impeachment and impeachment only.
Given this record, on appeal the State does not argue surprise or unexpected hostility. It simply asserts that Zach and Samantha were hostile to the prosecution, which is undoubtedly true but not in and of itself sufficient. A party may call a hostile witness and ask him leading questions. See M.R.E. 611. But impeachment with a pri- or inconsistent statement is no ordinary leading question, and it carries the additional requirement that the hostility be unexpected. See Wilkins, 603 So.2d at 322. And the State did not simply ask Zach and Samantha whether they had made the prior statements, it called three other witnesses to testify to detail the prior statements and introduced a tape recording of Zach’s statement into evidence. Absent the proper foundation for impeachment, all of that was rank hearsay.
¶ 17. There is no clear evidence in the record of whether the State was surprised by Zach and Samantha’s testimony. The dissent contends that this absence of evidence requires us to affirm the trial court’s decision, but it misconstrues the burden of production, which is on the State. The proponent of evidence “has the burden of laying the proper foundation.” Brown v. State, 969 So.2d 855, 867 (¶ 36) (Miss.2007). “[BJefore a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility.” Wilkins, 603 So.2d at 322 (emphasis added); see also Osborne, 54 So.3d at 845 (¶ 14) (proponent .must show surprise or unexpected hostility); Wharton, 734 So.2d at 987 (¶ 7) (same); Whitehead v. State, 967 So.2d 56, 67 (¶ 21) (Miss.Ct.App.2007) (“Based on Wilkins, we agree that the State was required to show surprise prior to impeaching its witness.”). Without the proper foundation, we cannot reach any other conclusion but that the trial court erred in admitting the impeachment evidence.
¶ 18. Having concluded the trial court erred, we must next turn to the question of whether the error is prejudicial. We will reverse on the erroneous admission of evidence only where “a substantial right of a party is affected.” Young v. State, 106 So.3d 775, 777 (¶ 9) (Miss.2012); see also M.R.E. 103(a). Errors in the admission of evidence are subject to a harmless error analysis because, as is often said, a defendant is entitled to a fair trial, not a perfect one. Conners v. State, 92 So.3d 676, 688 (¶ 33) (Miss.2012) (citing Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)). An error is harmless when “the same result would have been reached had it not existed.” Pitchford v. State, 45 So.3d 216, 235 (¶ 71) (Miss.2010). We review the record de novo to determine the error’s effect. Richardson v. State, 74 So.3d 317, 328 (¶ 37) (Miss.2011).
¶ 19. The State contends the admission of the impeachment evidence is harmless because its case against James was sufficient even if only the properly admitted substantive evidence is considered. That proof, however, is entirely circumstantial: James was angry with Ivory, he had threatened to kill and “burn” her, she was afraid of him, and he had been in the house before the attack and was gone afterwards. While this could sustain a conviction, the question before us is not *700 sufficiency; to find harmless error, we look for proof of guilt that is overwhelming. See, e.g., Rogers v. State, 95 So.3d 623, 629 (¶ 19) (Miss.2012); Stone v. State, 94 So.3d 1078, 1086 (¶ 21) (Miss.2012); States v. State, 88 So.3d 749, 758 (¶ 38) (Miss.2012).
¶ 20. The dissent contends that Zach’s naming his brother as the man he saw outside the house was nonhearsay under Mississippi Rule of Evidence 801(d)(1)(C), which provides that a statement is not hearsay if: “The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... one of identification of a person made after perceiving the person.” If Zach had identified his brother, it would be admissible as substantive evidence under Smith v. State, 25 So.3d 264, 272-73 (¶¶ 23-27) (Miss.2009). However, Zach never made a “statement of identification” as contemplated by Rule 801(d)(1)(C). The rule uses identification in a technical sense, referring to a witness identifying the defendant in a line-up, show-up, photo array, preliminary hearing, or the like. United States v. Kaquatosh, 242 F.Supp.2d 562, 566 (E.D.Wis.2003). It does not include “statements unaccompanied by recognition of the defendant or his likeness.” Id.; see also 2 Kenneth S. Broun et al., McCormick on Evidence § 251 n. 35 (6th ed. 2006) (“A few courts have erroneously ignored the purpose and language of the rule as to testimony about an identification of the defendant through an out-of-court identification procedure and instead allowed testimony that a certain person, known to the witness, committed a crime.”); 2 Michael H. Graham, Handbook of Federal Evidence § 801.13 n. 2 (6th ed. 2006) (“The concept of ‘after perceiving him’ should be interpreted to refer to perceiving the individual or a representation of him once again after the event in question.”). Rule 801(d)(1)(C) “was not intended to allow the introduction as substantive evidence of hearsay statements that ‘the defendant did it.’ ” Kaquatosh, 242 F.Supp.2d at 565.
¶ 21. The State also contends the harm was mitigated or abrogated entirely by the trial court’s instructions to the jury that it could only consider the testimony for impeachment and not as substantive evidence. The trial court, sua sponte, instructed the jury on this point three times during the presentation of the impeachment evidence and once more when finally charging the jury. That the jury was properly instructed cannot be denied. Our concern, however, is the efficacy of the cautionary instructions.
¶ 22. We are well aware that under most circumstances, the jury is presumed to follow the instructions of the trial court. Sanders v. State, 63 So.3d 497, 504 (¶ 19) (Miss.2011). However, as the United States Supreme Court has observed, “there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.” Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In Wilkins, our supreme court addressed this concern in the context of prior inconsistent statements. The court pointed out the inherent difficulty in following the cautionary instruction: if the jury believes the prior statement, i.e., that Ivory identified James as her attacker, how can it then put that aside and adjudicate his guilt based only on the State’s circumstantial case? The supreme court echoed a century-old observation that a jury attempting to comply with the instruction “might endeavor to do so, and believe they were doing so, and still be involuntarily and unconsciously in *701 fluenced thereby.” Wilkins, 603 So.2d at 319 (quoting Williams v. State, 73 Miss. 820, 826, 19 So. 826, 827 (1896)). The court further observed: “permitting a jury to hear such testimony and then instructing it not to consider it except for ‘impeachment’ has been called by one scholar ‘a pious fraud.’” Id. (citing Edmund M. Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L.Rev. 177, 193 (1948)).
¶ 23. The facts underlying the Wilkins decision are instructive as to the whether the error in our case is harmless. Wilkins was accused of killing his brother-in-law. Admissible evidence included, among other things, testimony that a coconspirator had told his wife Wilkins had “done it” and that he was burning Wilkins’s clothes because they were covered in “blood and brains.” See id. at 312. The wife’s testimony was admissible because the eoconspirator had made the statements to her in furtherance of a conspiracy. Id. at 317. When called to the stand by the State, the coconspirator denied that Wilkins had committed the murder and that he had burned Wilkins’s clothes. The prosecution then impeached him with unsworn statements he had made to a police investigator and a jailhouse snitch, consistent with the wife’s account. The Wilkins court found this to be error for reasons we have already discussed. Even though the improper impeachment was largely cumulative and the jury was properly instructed that it could not be considered as substantive evidence, the supreme court still found the error reversible. See id. at 316. Given that the case against Wilkins was much stronger than the case against James, we do not see how the error in James’s case can be harmless.
CONCLUSION
¶ 24. The State spent nearly half of its case-in-chief impeaching its two most important witnesses. This impeachment was improper, yet it put in front of the jury the most damning evidence in an otherwise circumstantial case. We cannot say with any confidence that this error was harmless. See Pitchford, 45 So.3d at 235 (¶ 71). We are therefore compelled to reverse James’s conviction and remand for a new trial consistent with this opinion.
¶ 25. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND JAMES, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY JAMES, J.; ROBERTS, J., JOINS IN PART. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P. J.

. That rule was also adopted in Mississippi, though it is most frequently cited in the context that a prosecutor may not ask impeachment questions without a good faith basis. See, e.g., Flowers v. State, 773 So.2d 309, 326 (¶ 58) (Miss.2000).