# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00231-SCT

*ANTHONY CAROTHERS a/k/a ANTHONY*
*CARROTHERS a/k/a ANTHONY CARRUTHERS*
*a/k/a AMP*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/04/2011 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| TRIAL COURT ATTORNEYS: | HONEY USSERY |
| | JOSH TURNER |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.    Anthony Carothers was convicted of two counts of aggravated assault and sentenced

to consecutive twenty-year terms in the Mississippi Department of Corrections for each count

(twenty years on Count I, and twenty years on Count II with five years to serve and fifteen years suspended). On direct appeal before the Court of Appeals, Carothers argued that the trial court erred by allowing the State to treat Sheena Carothers (Carothers's half-sister and the victim of the assaults) as a hostile witness. Finding merit to Carothers's argument, the Court of Appeals reversed his convictions and remanded for a new trial. *Carothers v. State*, 2012-KA-00231-COA, 2013 WL 5788776 (Miss. Ct. App. Oct. 29, 2013), *reh'g denied* (May 6, 2014). The State petitioned for writ of certiorari, asserting that the Court of Appeals had misapprehended material facts, including testimony of other witnesses. We granted the State's petition.

## FACTUAL BACKGROUND

¶2.     Carothers and Sheena are half-siblings. On the night of the incident, Sheena had taken her four children to Carothers's house for him to keep them while Sheena went out for the evening. Two other adults, Tanesshia Tyson and Jesse Booker, were with Sheena when she drove to Carothers's house. There, Carothers and Sheena got into an argument and Sheena exited the home. There are two versions of what happened next.

### Version 1

¶3.     According to Tyson's trial testimony, sometime after arriving at Carothers's house, Tyson and Booker walked three of the children inside Carothers's home. Sheena's two-year old child, Skylar, remained in Sheena's car. While inside the home, Tyson heard a gunshot outside. Tyson walked outside and saw Carothers holding a small, black handgun in his hand. The front passenger window to Sheena's vehicle was broken, and Tyson claimed it was shot out by Carothers. Tyson told Carothers to "calm down and stop." By that time,

2

Sheena was in her car, backing out of the driveway. Carothers told Tyson to move out of the way, "if [Tyson] didn't want to get shot[.]" Carothers aimed the gun toward Sheena and fired a second shot. Afterward, Carothers got into his truck and drove down the street after Sheena in the direction of Tyson's house, located just up the street. Tyson followed behind. When Tyson arrived up the road around the corner from Carothers's home, she saw Sheena lying in the middle of the road, bleeding; Sheena's vehicle was sitting in a field nearby; Skylar was still in the vehicle, sitting in the back seat of the car. Tyson said her aunt and uncle, Mary and Woodrow McThune, who live up the road from Carothers's home, were at the scene when she arrived. Carothers was not at the scene when Tyson arrived. Tyson later provided a statement to authorities, who were called to the scene shortly afterward. According to Tyson, Carothers called Tyson later, apologizing for what had happened. He also sent Tyson a text message, warning her not to talk to the police.

¶4.     Woodrow testified that, on the night of the incident, he heard the sound of a car hitting the back of another car. Woodrow walked out the front door of his home and "saw a red Blazer hit a Crown Vic, and they proceeded on around the road," which loops around Woodrow's house. At that point, Woodrow walked back through the house, and he and his wife Mary exited through the back door of the house. Woodrow then saw a car sitting in the field, and a young lady "laying almost in the highway, . . . covered in blood[,]" approximately seventy-five feet from the car. Mary called 911. Woodrow got Skylar out of Sheena's vehicle. Woodrow gave a statement to authorities after they arrived on the scene, which Woodrow testified was substantially the same as his testimony.

3

¶5.   Mary testified that, on the night of the incident, she saw a woman lying in the middle of the street.  Her face was swollen, and blood was coming out of her mouth.  Mary asked the woman who she was, to which the woman replied, "Sheena."  Mary asked Sheena who did this to her, to which Sheena replied, "Anthony."  Mary also provided a statement to authorities on the night of the incident, which Mary attested at trial was substantially the same as her trial testimony.

¶6.   Debra Heller, an emergency-room nurse at Baptist Hospital where Sheena was taken, testified that Sheena was admitted to the emergency room complaining that she had been assaulted.

¶7.   Investigator Jarett Bundren with the Lafayette County Sheriff's Department testified that, during his investigation, he spoke with Sheena that evening while she was at the hospital.  Sheena told Investigator Bundren that, when she took her children to Carothers's house for Carothers to watch, Carothers became irate.  Carothers came outside and shot her window out.  Sheena threw her car into reverse and backed out of Carothers's driveway.  Carothers shot at her again.  Sheena headed north on Old Taylor Road; Carothers drove up behind her and bumped her vehicle, causing her to wreck.  Sheena jumped out of the car and took off running.  Carothers chased her, caught her, and began slamming her face into the pavement and kicking her all over her body.

**Version 2**

¶8.   At trial, Sheena was called to testify on behalf of the State.  Sheena testified that she caused the argument with Carothers when he refused to babysit her children.  When Sheena attempted to get the remaining child, Skylar, out of the car, she threw a small tool at

4

Carothers, breaking the passenger window. Sheena said she drove away from Carothers's house at a fast rate of speed and that Carothers followed her in his vehicle because he was concerned for Skylar's safety. Sheena testified that she lost control of her vehicle because she was speeding and ran into a parked truck, but she was not badly injured.

¶9. At this point in Sheena's testimony, the State sought permission to treat Sheena as a hostile witness. Carothers objected, arguing that Sheena was not being hostile and that her testimony was consistent with testimony Sheena previously had given at a bond hearing for Carothers. The trial court allowed the State to treat Sheena as an adverse witness. The State then proceeded to ask Sheena leading questions and read portions of Investigator Bundren's report. Sheena denied that she had ever talked to Investigator Bundren, and she disputed every detail of the other version of her story.

¶10. Carothers gave testimony substantially similar to Sheena's trial testimony during his case-in-chief.

**Direct Appeal:**

¶11. On direct appeal, Carothers argued he was denied a fair trial because the State was allowed to introduce prior, inconsistent statements of its own witness. Carothers contended that allowing the State to treat Sheena as a hostile witness was improper because the State was not "surprised" by her testimony and that she was not "hostile" to the State's questioning, for purposes of Rule 607 of the Mississippi Rules of Evidence. The Court of Appeals agreed, finding that the trial court had abused its discretion because the State was not surprised by Sheena's testimony. The Court of Appeals found that the error constituted reversible error because (1) if the trial court had not allowed the State to introduce the

impeachment testimony against Sheena, her testimony would have corroborated Carothers's testimony, and (2) without the impeachment testimony, there was no overwhelming evidence of guilt; and both Sheena's and Carothers's testimony contradicted Tyson's version of the events that night.

**Petition for Writ of Certiorari**

¶12. The State petitioned for writ of certiorari, claiming that the Court of Appeals had failed to take into account testimony from both Woodrow and Mary in its analysis of the case. The State contends that this testimony corroborated the State's theory of the case, and the Court of Appeals had erred by not affirming Carothers's conviction under harmless error.

¶13. Having granted the State's certiorari petition, we find that the Court of Appeals did not take into consideration Rule 801(d)(1)(c) (identification evidence), Rule 803(2) (excited utterances), and Rule 803(4) (medical diagnosis and treatment) of the Mississippi Rules of Evidence. Because each of the complained-of statements would not have been excluded by the rule against hearsay, any error by the trial court with regard to these statements for purposes of Rule 607 was harmless beyond a reasonable doubt. Further, we hold that while the elements of surprise and/or unexpected hostility are an acceptable basis for allowing a party to impeach its own witness, neither is required for purposes of Rule 607. To the extent *Wilkins v. State*, 603 So. 2d 309, 322 (Miss. 1992), holds otherwise, it is hereby overruled. Instead we hold that, in order to prevent abuse of Rule 607, impeachment of one's own witness should be only allowed when circumstances indicating good faith and the absence of subterfuge are present.

**DISCUSSION**

6

¶14.    An appellate court's standard of review of a trial court's admission or exclusion of evidence is abuse of discretion.  **Osborne v. State**, 54 So. 3d 841, 845 (Miss. 2011).  "Reversal is proper only where 'the error adversely affects a substantial right of a party.'"  **Id**. (quoting **Ladner v. State**, 878 So. 2d 926, 933 (Miss. 2004)).  A trial court's decision will be affirmed on appeal where the right result is reached, even though we may disagree with the reason for that result.  **Smith v. State**, 25 So. 3d 264, 273-74 (Miss. 2009).

¶15.    Rule 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him."  Under this rule, a party may introduce for impeachment purposes unsworn pretrial inconsistent statements by the party's own witness.  **Wilkins v. State**, 603 So. 2d 309, 322 (Miss.  1992).  Generally, because such statements are fraught with hearsay problems, they may be introduced at trial only for impeachment purposes, not as substantive evidence.  **Id**.  While Rule 607 makes no mention of it, this Court's precedent requires that "before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness," there must be a showing of "surprise" by the witness's testimony "or unexpected hostility" from the witness.  **Id**.  Though most other jurisdictions no longer require such a showing, primarily because they regard the requirement as an unnecessary remnant of the common-law voucher rule, which Rule 607 purportedly was enacted to do away with,[1] Mississippi does, for reasons expressed by the **Wilkins** Court.  According to **Wilkins**, "if there is in fact no surprise, the only possible

---

[1] "Rule 607 is a repudiation of the old voucher rule."  Miss. R. Evid. 607 cmt.

7

motive for attempting to impeach one's own witness is to get otherwise inadmissible testimony into evidence." *Id*. at 321.

¶16.     We think this is too skeptical a view of Rule 607.  Our rule is patterned after Rule 607 of the Federal Rules of Evidence.  In a special concurring opinion in *James v. State*, 124 So. 3d 693, 704 (Miss. Ct. App. 2013), Judge Maxwell pointed out that Rule 607, in general, "was predicated on the modern reality that 'a party does not hold out his witness as worthy of belief, since he rarely has a free choice in selecting them.'" *James*, 124 So. 3d at 702 (quoting *Walker v. State*, 144 Md. App. 505, 798 A.2d 1219, 1231 (2002), *overruled on other grounds*).  "In light of this reality, . . . any party, including the sponsoring party, may attack the witness's credibility." *James*, 124 So. 3d at 702 (citing Miss. R. Evid. 607). Because Federal Rule 607 did away with the voucher rule, federal courts have recognized that "Rule 607 also did away with the exceptions used to get around the voucher rule." *Id*. (citing *Walker*, 798 A.2d at 1231; *United States v. Ienco*, 92 F.3d 564, 568 (7th Cir. 1996); *United States v. Kane*, 944 F.2d 1406, 1412 (7th Cir. 1991); *United States v. Webster*, 734 F.2d 1191, 1193 (7th Cir. 1984); *Robinson v. Watts Detective Agency, Inc*., 685 F.2d 729, 740 (1st Cir. 1982); *United States v. DeLillo*, 620 F.2d 939, 946-47 (2d Cir. 1980); *United States v. Dennis*, 625 F.2d 782, 795 n.6 (8th Cir. 1980); *Scholz Homes, Inc. v. Wallace*, 590 F.2d 860, 863 (10th Cir. 1979); *United States v. Palacios*, 556 F.2d 1359, 1363 (5th Cir. 1977); *United States v. Long Soldier*, 562 F.2d 601, 605 n.3 (8th Cir. 1977)).

¶17.     "[F]ederal courts shifted from honing on surprise to focusing on the actual purpose for impeachment, asking whether the government is abusing Rule 607 by calling a witness who otherwise has no useful, admissible evidence for the purpose of admitting prior

8

inconsistent testimony suggesting the defendant's guilt." *Jones*, 124 So. 3d at 702-03 (Maxwell, J., specially concurring) (citing *Kane,* 944 F.2d at 1411; *Webster*, 734 F.2d at 1192; *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975)). By "interpreting Rule 607 to have done away with the voucher rule and its exceptions of surprise and unexpected hostility does not ignore [this Court's] concerns in *Wilkins*–that the abolishment of the voucher rule may lead to the inappropriate use of inadmissible hearsay evidence under the guise of impeachment." *Jones*, 124 So. 3d at 703. While Federal Rule 607 does not require surprise, it also does not permit subterfuge. *Id*. (citing *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981)). "That is why the federal courts, when faced with the government seeking to impeach its own witness, look for subterfuge–the abuse of Rule 607–and not surprise–the exception to the abolished voucher rule." *Id*. (citing *DeLillo*, 620 F.2d at 946-47).

¶18.   We point out that the *Wilkins* Court saw no distinction between the two measures. According to the *Wilkins* Court, the problem with the federal court's rationale is "first, . . . it makes admissibility of evidence depend on what is in the attorney's head, a rather difficult undertaking; and second, if there is in fact no surprise, the only possible motive for attempting to impeach one's own witness is to get otherwise inadmissible testimony into evidence." *Wilkins*, 603 So. 2d at 322. *Wilkins* opined, "Administering the rules of evidence would be much easier if the Federal courts of appeal had, as [some] commentators have suggested, directly interpreted Rule 607 as requiring surprise before permitting a party to impeach his own witness with an unsworn prior inconsistent statement, rather than reaching the identical result by indirection." *Id*.

9

¶19. There are structural problems with this rationale. As Judge Maxwell pointed out in his special concurrence in *James*, "by still mandating surprise or unexpected hostility, Mississippi actually clings to the old disfavored mechanical approach that in fact led to the creation of Rule 607." *James*, 124 So. 3d at 703. Indeed, in criticizing Mississippi's common-law voucher rule, the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), explained:

> The rule rests on the presumption–without regard to the circumstances of that particular case–that a party who calls a witness "vouches for his credibility." *Clark v. Lansford*, 191 So. 2d 123, 125 (Miss. 1966). Although the historical origins of the "voucher" rule are uncertain, it appears to be a remnant of primitive English trial practice in which "oath-takers" or "compurgators" were called to stand behind a particular party's position in any controversy. Their assertions were strictly partisan and, quite unlike witnesses in criminal trials today, their role bore little relation to the impartial ascertainment of the facts. [Footnote omitted].
>
> Whatever validity the "voucher" rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process. [Footnote omitted]. It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity. Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony. But in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them.

*Chambers*, 410 U.S. at 296.

¶20. Argument similar to *Wilkins*'s rationale was presented to the Seventh Circuit Court of Appeals in *Webster*. Rejecting it, Judge Posner, writing for the *Webster* Court, explained as follows:

> Webster [ (the defendant) ] urges us . . . to go beyond the good-faith standard and hold that the government may not impeach a witness with his prior inconsistent statements unless it is surprised and harmed by the witness's

10

testimony. But we think it would be a mistake to graft such a requirement to Rule 607, even if such a graft would be within the power of judicial interpretation of the rule. Suppose the government called an adverse witness that it thought would give evidence both helpful and harmful to it, but it also thought that the harmful aspect could be nullified by introducing the witness' prior inconsistent statement. As there would be no element of surprise, . . . the introduction of the prior statements [would be forbidden]; yet we are at a loss to understand why the government should be put to the choice between the Scylla of forgoing impeachment and the Charybdis of not calling at all a witness from whom it expects to elicit genuinely helpful evidence. The good-faith standard strikes a better balance.

*Webster*, 734 F.2d at 1193.

¶21. We agree with this reasoning. The good-faith standard strikes a better balance between the truth-finding process at trial and ensuring a fair trial for the parties concerned. While the elements of surprise and/or unexpected hostility are (and remain) an acceptable basis for allowing a party to impeach its own witness, they are not required for purposes of Rule 607. We hold that, to prevent abuse of Rule 607, impeachment should not be allowed where the trial court finds the purported purpose of impeachment for offering the statement(s) is in bad faith, or is subterfuge to mask the true purpose of offering the statement(s) to prove the matter asserted. *See, e.g., State v. Hunt*, 378 S.E.2d 754, 758 (N.C. 1989) (citing *DeLillo*, 620 F.2d 939; *Webster*, 734 F.2d 1191). Our trial judges are well-suited to make these calls. To the extent that *Wilkins* holds otherwise, it is overruled.

¶22. Here, Sheena was a principal witness in the case. While parts of her testimony were not supportive of the State's charges against Carothers, other aspects of her testimony were relevant and provided important, detailed facts surrounding the incidents that led to the charges. Although the State could not call Sheena solely for the purpose of impeaching her with her prior statements, the State was entitled to prove the relevant facts about which

11

Sheena testified. Based on the record before us, we find no abuse of discretion in the trial court's decision to allow the State to impeach Sheena's testimony with prior contradictory statements.

¶23. Further, even if Rule 607 was inapplicable in this case, it cannot be said that Carothers was denied his right to a fair trial, as each of the complained-of statements either was not hearsay, or qualified under an exception to the rule against hearsay. *See, e.g.*, **Smith**, 25 So. 3d at 273-74 (although victim's out-of-court statements were not admissible as prior inconsistent statements for impeachment purposes, the statements were admissible for identification purposes under Rule 801(d)(1)(C)). Based on the record before us, we find that Rules 801(d)(1)(C), 803(2), and/or 803(4) were applicable in this case.

¶24. Pursuant to Rule 801(d)(1)(C), identification evidence is not hearsay and is admissible as substantive material evidence. In 1977, prior to adopting our rules of evidence, this Court held that when the principal witness's identification testimony is impeached, "independent evidence of the identification may be introduced through third persons present at the out-of-court identification." **Fells v. State**, 345 So. 2d 618, 622 (Miss. 1977), superseded by statute on other grounds. The theory behind this standard is that the "initial identification, being nearest in time to the event has . . . the greater likelihood of accuracy and truthfulness being undimmed by fading memory and intervening events occasioned by the passage of time." *Id*. at 622.

¶25. Similarly, Rule 803(2) provides an exception to the rule against hearsay for "excited utterances." The rule defines such a statement as "relating to a startling event or condition

12

made while the declarant was under the stress of excitement caused by the event or condition." Miss. R. Evid. 803(2). The comment to the rule elaborates:

> The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. . . . [T]he essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly. . . .

Miss. R. Evid. 803(2) cmt.

¶26. Likewise, Rule 803(4) exempts statements made for purposes of medical diagnosis and treatment from the otherwise stringent prohibition against hearsay. Immediately following the alleged incidents with Carothers, Sheena, while lying wounded in the street, told Mary that Carothers had done this to her. Miss. R. Evid. 801(d)(1)(C) and 803(2). Upon arriving at the emergency room, Sheena told a treating nurse that her injuries resulted from an assault. Miss. R. Evid. 803(4). Shortly thereafter, Investigator Bundren spoke with Sheena while at the hospital. He said Sheena appeared scared, and she told him what had transpired that evening and who was responsible. The trial court very well could have found that Sheena's statements to Investigator Bundren were related to a "startling event" while she was "under the stress of the excitement caused by the event." Miss. R. Evid. 803(2).

## CONCLUSION

¶27. For these reasons, we find that the Court of Appeals erred in reversing Carothers's convictions and sentences. The judgment of the Court of Appeals is reversed, and the Lafayette County Circuit Court's judgment of conviction and sentences are reinstated and affirmed.

13

¶28. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED. COUNT I: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH FIVE (5) YEARS TO SERVE AND FIFTEEN (15) YEARS SUSPENDED, AFFIRMED. SENTENCES IN COUNT I AND COUNT II ARE TO BE SERVED CONSECUTIVELY. APPELLANT IS TO PAY $1000 FINE AND $979.50 IN COURT COSTS.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, KING AND COLEMAN, JJ., CONCUR.**