# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-KA-00814-SCT

*DARRON LASHAUN THAMES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2019 |
| TRIAL JUDGE: | HON. CHRISTOPHER A. COLLINS |
| TRIAL COURT ATTORNEYS: | CHRISTOPHER MORGAN POSEY |
| | STEVEN SIMEON KILGORE |
| | JAMES EDWIN SMITH, III |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ERIN ELIZABETH BRIGGS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| | ALLISON K. HARTMAN |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/04/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEES, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Darron Lashaun Thames was indicted by a Newton County grand jury for conspiracy to commit murder and accessory after the fact to murder. Thames was acquitted by a jury of the conspiracy charge, but he was found guilty of accessory after the fact to murder under Mississippi Code Section 97-1-5 (Rev. 2014). Thames appeals from his conviction claiming

that he was unfairly prejudiced by the State's use of impeachment evidence and transcript testimony of a prosecution witness who had previously testified at a guilty-plea proceeding and at another trial. Thames further claims that his conviction is not supported by sufficient evidence and that the jury's guilty verdict is not supported by overwhelming weight of evidence. Finding no reversible error, we affirm Thames's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2. Jamarcus Townsend was shot shortly before midnight on March 17, 2017, in front of Derrick Grass's house at 113 Tillman Street in Newton, Mississippi. By the time police arrived to the scene, Townsend was dead.

¶3. Officers quickly developed Lyndale Jones, Richard Lofton, Jordan Myers, and Robbie Chapman as suspects. Lofton, Myers, and Chapman were members of the Black Disciples gang, while Jones was an aspiring member. Townsend was a member of a rival gang, the Vice Lords. Leading up to the shooting, there had been several altercations between the two gangs in and around the Newton area.

¶4. Months before Townsend's killing, Townsend, Grass, and other members of the Vice Lords purportedly had been riding around town displaying weapons and shooting at various members of the Black Disciples. In one instance, Townsend purportedly shot and wounded Robert Bender, an elder member of the Black Disciples. In another, Townsend purportedly shot into a vehicle occupied by Thames, also an elder member of the Black Disciples. Thames was in his late twenties at the time, and he was referred to as "Uncle D." Riding in

2

the vehicle with Thames was Thames's girlfriend, Ashton Thompson and their baby daughter. Ashton is Bender's daughter.

¶5.    Witnesses at the scene of Townsend's killing identified Jones's vehicle as the one from which the shots were fired. Jones was arrested a couple of hours later. Jones told authorities that Lofton, Myers, and Chapman were with him in the vehicle at the time of the shooting. Chapman turned himself in to local authorities three days later. Local authorities were unable to find Lofton and Myers and they eventually asked the U.S. Marshals Service for assistance. The U.S. marshals found Lofton and Myers approximately twelve days later "hiding out" in Meridian, Mississippi.

¶6.    From their investigation, authorities learned that before Townsend's killing, a number of meetings had taken place among the Black Disciples. On March 17, Jones, Lofton, Myers, and Chapman traveled in Jones's vehicle from Thames's cousin's place to a Chevron gas station in Newton. There, the four were met by Thames, who was riding in another vehicle driven by Ashton.

¶7.    Video surveillance from the gas station presented at trial shows the vehicle occupied by Thames arrive at the Chevron around 11:00 p.m.[1] Moments later, Jones's vehicle pulled up. Jones got out of his vehicle and walked over to the vehicle occupied by Thames and purportedly received $5 for gas from someone in the vehicle. After fueling up, Jones's

---

[1] According to Investigator Bruce McGraw with the Newton Police Department, the time depicted on the video footage was an hour off, possibly due to the video clock's not having been changed to daylight saving time.

3

vehicle left the gas station, and the vehicle occupied by Thames left a couple of minutes afterwards.

¶8.    Shortly before midnight, gun shots rang out in front of 113 Tillman Street. Ten minutes later, Jones's vehicle arrived at Ashton's mobile home, where Thames and others were sitting outside drinking beer.

¶9.    According to Thames in one of his statements to authorities, he was told by the four that Jones's vehicle had been shot at and that they had returned fire. Thames said he did not know at the time if anyone was killed. The guns were removed from Jones's vehicle and put somewhere on Ashton's property.

¶10.   Thames said that he was concerned about retaliation and that he told Jones to get his vehicle away from the property. Thames said that he and Ashton followed Jones to Jones's "papaw's" place, where Jones parked the vehicle. Thames then told Jones not to come back to Ashton's place. Lofton, Myers, and Chapman remained at Ashton's during this time.

¶11.   When Thames and Ashton arrived back to her place, they saw on Facebook that Townsend had died. Afterwards, the group went to sleep. The next day, Ashton and Jessica Powers drove Lofton, Myers, and Chapman to Meridian.

¶12.   Following Jones's arrest on March 18, a search warrant was issued for Ashton's address. Jones told authorities that a 12-gauge shotgun, a 20-gauge shotgun, an AK47 rifle, and a 9mm handgun were used in the shooting and that they would find the weapons on Ashton's property. Approximately twelve hours after the shooting, officers executed the search warrant and found a Remington Model 870 shotgun and an old shirt wrapped with

4

more than one-hundred rounds of ammunition on Ashton's property. Although authorities determined that a shotgun was used in the shooting, the gun found on Ashton's property was never established as the weapon that killed Townsend.

¶13. Thames was arrested on April 21, 2017. He was interviewed by local authorities and subsequently by agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). In both interviews, Thames denied any involvement in Townsend's shooting. When asked by authorities why the four went to an area where Vice Lord members resided, Thames said it was because of an argument that had occurred over the phone while they were at Thames's cousin's place. Thames said he warned the four not to go to Tillman Street.

¶14. In August 2018, Lofton pleaded guilty to conspiracy to commit murder. As part of his plea agreement, Lofton agreed to testify against others involved in the case.

¶15. Ashton was charged with accessory after the fact to murder. At her trial in August 2018, Lofton testified that he was a member of the Black Disciples. He said there had been an ongoing conflict between the Black Disciples and the Vice Lords in Newton resulting in shootings in and around Newton. According to Lofton, Townsend had been involved in these shootings. Eventually, it was decided by the Black Disciples that Townsend "has to go." Lofton said Thames was a part of this decision.

¶16. According to Lofton's testimony at Ashton's trial, on the evening of March 17, Lofton, Thames, and other Black Disciple members were hanging out at "Big Dave's" house. There, it was decided that Lofton, Myers, and Chapman would "go looking for" Townsend.

Jones drove up in his vehicle soon after. Lofton, Myers, and Chapman got into Jones's vehicle.

¶17. Lofton said that he, Chapman, and Jones already had guns and that Thames had provided Myers with a 9 mm pistol so that all four of them would have guns. The four drove from Big Dave's house to the Chevron to meet Thames, who gave Jones some gas money.

¶18. After leaving the Chevron, the four drove to Tillman Street, where they knew Townsend would be located. Lofton described Tillman as a dead-end street about eighty to ninety yards long. Grass's house was close to the end of the street. The four initially drove past Grass's house and turned around at the end of the street.

¶19. According to Lofton, "That's when my window rolled down and somebody came out shooting at us[,]" and "[w]e shot back." Afterwards, the four drove to Ashton's place. When they arrived, Thames came outside and asked them what happened. They told Thames that "[s]omebody shot at us and we shot back." The next day, Ashton and Powers drove Lofton, Myers, and Chapman to Meridian where they stayed with other members of the Black Disciples.

¶20. At Thames's trial, Lofton was called by the State as a witness. Lofton admitted that he had pleaded guilty to conspiracy to commit murder, stating, "I signed a plea for conspiracy, but from what I know, I'm getting my charge back." Lofton then denied that he was a member of the Black Disciples and claimed that he had never heard of the Black Disciples. The State then sought permission from the trial judge to treat Lofton as a hostile witness under Rule 611(c) of the Mississippi Rules of Evidence.

¶21. Thames's counsel objected somewhat, stating: "Your Honor, he's been asked two questions other than his name and his rank, and he's - -" The trial judge interjected, stating for the record as follows: "The last time [Lofton] was under oath in my courtroom in front of a jury he boasted with great pride that he was a member of the Black Gangster Disciples. He has now either perjured himself the first time [sic] or perjured himself this time. I think the threshold has been passed."

¶22. The State questioned Lofton extensively with regard to his participation in Townsend's shooting along with his testimony at Ashton's trial and his guilty-plea testimony. The State also questioned Lofton with regard to written statements he had provided to investigators after his arrest.

¶23. During the State's examination, Lofton admitted his involvement in the shooting, while maintaining that Townsend and others shot at them first as they drove by Grass's house on Tillman Street. Lofton also affirmed that before Townsend's killing, he, Thames, and Bender had been shot at by Townsend and others. While Lofton acknowledged that he had previously testified that the prior shootings were gang related, he disavowed his prior testimony by saying that he had no knowledge whether any of the individuals involved in those shootings were members of a gang.

¶24. Lofton admitted that in his testimony at Ashton's trial, he had said that a meeting among the Black Disciples had occurred at which it was decided that Townsend "has to go." But he admitted that before anything was done, they had to get Thames's permission since Thames was in charge of security for the gang. Lofton also admitted that he had testified at

7

his guilty-plea proceeding that Thames had given him, Chapman, Jones, and Myers the "green light to go shoot up Grass's house." And the next morning, after everyone had learned that Townsend was dead, Thames instructed Ashton to take him, Myers, and Chapman to Meridian.

¶25. But Lofton later Thames denied that was the case. Lofton said there was no meeting at Big Dave's house before Townsend's killing on March 17. Lofton said that he and others were at Big Dave's "just chilling," and he was not sure who all was there because it was dark. Lofton denied that Thames gave them the green light to go shoot Townsend or to shoot up Grass's house. Lofton admitted that he, Myers, Chapman, and Jones went to the Chevron after leaving Big Dave's. But he later claimed that it was not prearranged for Thames to meet them there, and he did not know if Thames was at the gas station when they stopped to get gas.

¶26. Lofton acknowledged that after the shooting on Tillman Street, the four of them went directly to Ashton's place. But he later said that Thames was not there and that he and the others that were there did not talk about the shooting. Lofton said that he, Myers, and Chapman were driven to Meridian the next morning by Ashton and Powers. He denied that they were taken to a Black Disciples member's house.

¶27. On cross-examination, Thames's counsel questioned Lofton about his changing his story. Defense counsel asked Lofton about his initial statement to authorities, in which Lofton denied being involved in Townsend's shooting, and about Lofton's written statement dated April 9, 2017, in which Lofton stated they "got the green light from Uncle Dee to kill

8

Jamarcus." Lofton said that he believed the April 9 statement would help his current circumstances at the time.

¶28. Defense counsel then asked Lofton about his own indictment for first-degree murder and his subsequent guilty plea to conspiracy to commit murder. Lofton said he understood that the former carries a life sentence, but that he would be eligible for parole under the latter. According to Lofton, he would be eligible for parole in 2022. Lofton then acknowledged that as part of his plea agreement, he was required to testify in both Ashton's and Thames's respective trials.

¶29. Defense counsel next asked Lofton about a letter Lofton wrote to Ashton's attorney soon after he testified at her trial. Over the State's objection, the trial judge allowed defense counsel to submit the letter into evidence. Lofton read the letter to the jury in which Lofton claimed that he "lied about Ashton and everybody else knowing about what had happened." Lofton said in the letter that he wanted to set the record straight because "I thought that being free was more important than another's lives [sic], but I was wrong and it has only made me feel worse and I can't handle it emotionally."

¶30. On redirect, the State submitted into evidence Lofton's written statement of April 9,2017 and the written statement Lofton made to investigators on April 21, 2017. The State also submitted into evidence the transcripts of Lofton's guilty-plea proceeding and Lofton's testimony at Ashton's trial.

¶31. The jury found Thames not guilty of conspiracy to commit murder and guilty of accessory after the fact to murder. This appeal followed.[2]

## DISCUSSION

### I. Whether Thames was unfairly prejudiced by the use of impeachment evidence and Lofton's previous testimonies.

¶32. Thames argues that the State's use of Lofton's unsworn impeachment hearsay evidence was not properly limited by the trial court under Rule 105 of Mississippi Rules of Evidence in the jury's deliberation; that the evidence was misused by the trial court in denying a directed verdict and motion for a new trial; and that the evidence was mischaracterized by the State as substantive evidence. Thames further contends that he was unfairly prejudiced by the introduction of extrinsic evidence consisting of Lofton's written statements to authorities, along with the transcripts of his guilty-plea proceeding and testimony from Thompson's trial. Thames also claims that his trial counsel was constitutionally ineffective for not objecting to the improper use of Lofton's impeachment evidence, for not requesting a limiting instruction under Rule 105 of the Mississippi Rules of Evidence, and for not requesting a balancing analysis under Rule 403 of the Mississippi Rules of Evidence.

---

[2] Initially, the Office of Indigent Appeals filed a ***Lindsey*** brief, certifying that it found no arguable issues to appeal. *See **Lindsey v. State***, 939 So. 2d 743 (Miss. 2005). Thames did not file a pro se brief. This Court requested supplemental briefing from both the Office of Indigent Appeals and the State to address the admissibility of certain evidence, along with the sufficiency and/or the weight of the evidence in support of Thames's conviction and/or the jury's guilty verdict for accessory after the fact.

10

¶33. The State argues that Lofton's prior unsworn statements were properly used as impeachment evidence and that Lofton's prior statements made under oath at Lofton's guilty-plea proceeding and at Ashton's trial were properly admitted as substantive evidence. The State contends that Thames waived his right to a Rule 105 limiting instruction and a Rule 403 balancing test by not requesting either.

¶34. This Court's reviews a trial court's decision to allow or exclude evidence under an abuse-of-discretion standard. *Cole v. State*, 126 So. 3d 880, 883 (Miss. 2013). If error is found, "this Court will not reverse unless the error adversely affects a substantial right of a party." *Hargett v. State*, 62 So. 3d 950, 953 (Miss. 2011) (internal quotation mark omitted) (quoting *Ladnier v. State*, 878 So. 2d 926, 933 (Miss. 2004)).

¶35. Because Thames did not object at trial to the State's use of Lofton's prior inconsistent statements (sworn or unsworn) or request a Rule 105 limiting instruction or a Rule 403 balancing test, the issue is barred from review absent plain error. *Roby v. State*, 183 So. 3d 857, 870-71 (Miss. 2016). "To preserve an issue for appeal, a contemporaneous objection must be made." *Walker v. State*, 913 So. 2d 198, 238 (Miss. 2005) (citing *Ratliff v. State*, 313 So. 2d 386 (Miss. 1975)); *see also Pitchford v. State*, 45 So. 3d 216, 238-39 (Miss. 2010) (failure to raise a Rule 403 objection at trial bars the issue from review); *Sipp v. State*, 936 So. 2d 326, 331 (Miss. 2006) ("it is the responsibility of defense counsel to ask for [a limiting] instruction" (citing *Brown v. State*, 890 So. 2d 901, 913 (Miss. 2004))). The reason for the rule is "to enable the trial court to correct an error with proper instructions to the jury whenever possible." *Walker*, 913 So. 2d at 238 (citing *Gray v. State*, 487 So. 2d 1304, 1312

11

(Miss. 1986)).  "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Johnson v. State*, 155 So. 3d 733, 738 (Miss. 2014) (quoting *Burdette v. State*, 110 So. 3d 296, 303 (Miss. 2013)).

¶36.    The State requested and was granted permission to treat Lofton as a hostile witness under Rule 611(c), which allows leading question on direct examination "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  This Court has provided a test "to determine how closely the witness must be identified with the adverse party in order to be considered hostile[.]" *McFarland v. State*, 707 So. 2d 166, 175 (Miss. 1997) (citing *Harris v. Buxton T.V., Inc.*, 460 So. 2d 828, 833 (Miss. 1984)).  As reiterated in *McFarland*, the test provides as follows:

> (1) If the witness' acts or omissions are the predicate for a party's claim or defense, . . . , then that witness is ordinarily sufficiently identified with an adverse party and may be called as an adverse witness and interrogated by leading questions.
>
> (2) If the conduct of the witness plays such an integral part in the transaction or occurrence which is the subject of the action and which gives rise to . . . potential liability, . . . , then again the witness is said to be sufficiently identified with the adverse party so that the witness may be called as an adverse witnessed and cross examined.

*Id.* (quoting *Harris*, 460 So. 2d at 833).[3]

¶37.    Before the State had requested permission from the trial judge to treat Lofton as a hostile witness, Lofton, in response to the State's questions, attested that his guilty plea to

---

[3]  The Advisory Committee Note to Rule 611 states, "the Advisory Committee is cognizant of the *Harris* decision but considers the interpretation and application of the phrase 'identified with the adverse party' to be broader than that expressed in *Harris*."

conspiracy to commit murder arose out of the same facts and circumstances as those predicating the case against Thames. Lofton then denied any affiliation with or knowledge of the Black Disciples gang, a probative circumstance in the State's case against Thames. As the trial judge noted, Lofton had previously admitted under oath being a member of the gang and, now at Thames's trial, now denied it. Accordingly, the trial court found that the State had demonstrated the threshold requirements for Rule 611. We find no plain error in the trial court's ruling.

¶38. The State then elicited testimony from Lofton about the events surrounding Townsend's shooting. As mentioned, Lofton admitted his participation in the shooting and to what had occurred before and after the shooting. But he denied that this was a gang related shooting and that Thames had any involvement. The State questioned Lofton throughout about his prior testimonies and certain written statements he had made to investigators after his arrest.

¶39. For the most part, Lofton did not deny making any prior statement which the State questioned him about. He claimed throughout that he had either lied at the time he made the statement, that his story had changed, or that he did not remember. As mentioned, the transcripts containing Lofton's prior sworn testimonies, along with Lofton's prior unsworn written statements made to investigators were submitted into evidence during the State's redirect examination of Lofton.

13

¶40.   We find no plain error here.  Nor do we find any attorney error amounting to constitutional ineffectiveness[4] for failure to object to this evidence, request a Rule 403 balancing test, or a limiting instruction from the trial court.

¶41.   At the outset, under Rule 801(d)(1)(A) of the Mississippi Rules of Evidence, a witness's prior inconsistent statement is not hearsay and may be used as substantive evidence to prove the truth of the matter asserted if the statement was given under oath and if the declarant testifies and is subject to cross-examination concerning the statement.  MRE 801(d)(1)(A); *see **Gleeton v. State***, 716 So. 2d 1083, 1090 (Miss. 1998) (finding no error in trial court's allowing witness's plea-hearing transcript into evidence at defendant's criminal trial under Rule 801(d)(1)(A) when witness was called by the state, gave contradictory testimony, and was subject to cross-examination), *superseded on other grounds as stated in **Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 35 (Miss. 2003); s*ee also **United States v. Tinghui Xie***, 942 F.3d 228, 238 n.33 (5th Cir. 2019) (finding no Confrontation Clause violation in using witness's prior grand jury testimony as substantive evidence against defendant when defendant had opportunity at trial to cross-examine witness about her prior sworn testimony).

¶42.   Throughout the State's examination of Lofton, Lofton was given the opportunity to admit, deny, or explain his prior sworn statements.  And he continuously contradicted in fact what he had previously testified to under oath.  "[A] prior statement is inconsistent if under

---

[4] *See **Strickland v. Washington***, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984) (conduct that "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").

any rational theory its introduction might lead to a conclusion different from the witness's testimony." ***Pustay v. State***, 221 So. 3d 320, 332 (Miss. Ct. App. 2016) (alteration in original) (internal quotation marks omitted) (quoting ***Everett v. State***, 835 So. 2d 118, 122 (Miss. Ct. App. 2003)).

¶43. The inconsistency requirement of Rule 801(d)(1)(A) was met, as were the foundational requirements under Rule 613 of the Mississippi Rules of Evidence, so as to allow for proper cross-examination by the defense. Given the admissibility of this evidence, we see no deficiency on defense counsel's part by not objecting to it.

¶44. As for Lofton's prior unsworn statements, we think defense counsel certainly could have attempted to keep them out of the trial and may have been successful in doing so. But the decision not to do so clearly falls under trial strategy in this instance.

¶45. First, unlike prior sworn inconsistent statements, prior unsworn inconsistent statements, as a rule, are allowed to be used at trial only as impeachment evidence, not as substantive evidence. ***Carothers v. State***, 152 So. 3d 277, 282 (Miss. 2014) ("Generally, because such statements are fraught with hearsay problems, they may be introduced at trial only for impeachment purposes, not as substantive evidence."). Because Lofton often did not deny having made most of his prior unsworn statements, claiming at times that he had lied when he made the statement, there arguably was no use for that particular statement as impeachment evidence.

¶46. That said, however, Lofton's prior sworn and unsworn statements fairly coincide with one another. And given the admissibility of Lofton's prior sworn inconsistent statements,

15

any success in keeping Lofton's prior unsworn inconsistent statements out of the trial through a Rule 403 balancing test or otherwise would have been minimal at most.

¶47. Further, defense counsel likely realized that with Lofton being called as a state's witness for the State, detrimental substantive evidence was going to presented against Thames one way or another. Thus, we cannot second guess the defense's trial strategy in this case.

¶48. As mentioned, during cross-examination of Lofton, defense counsel brought out the fact that Lofton had initially told investigators that he was not involved in Townsend's shooting. Defense counsel then amplified the fact that Lofton initially was charged with murder but later pleaded guilty to conspiracy to commit murder in exchange for providing testimony against others. Also, over the State's objection, defense counsel successfully introduced into evidence for the jury's consideration a letter form Lofton to Ashton's legal counsel repudiating his testimony at Ashton's trial. The trial court allowed this otherwise inadmissible letter into evidence, finding that it gave "a complete picture of the situation." In turn, the State submitted Lofton's sworn and unsworn prior inconsistent statements into evidence.

¶49. Because these unsworn statements were submitted into evidence without limitation, both parties were free to reference this evidence during their respective closing arguments. *See Gunn v. State*, 174 So. 3d 848, 862 (Miss. Ct. App. 2014) (because the defendant agreed to the introduction of out-of-court statements into evidence without limitation, the State was "free to refer to them as substantive evidence" in closing argument).

¶50. For these reasons, we find that Thames has failed to demonstrate plain error on the part of the trial court with regard to the admissibility of Lofton's prior sworn statements or his unsworn statements. And we find that Thames has failed to demonstrate constitutional ineffectiveness on the part of defense counsel for not requesting a Rule 105 limiting instruction or a Rule 403 balancing test with regard to Lofton's prior unsworn statements.

II. **Whether the trial court erred by denying Thames's request for a peremptory instruction directing the jury to find him not guilty of accessory after the fact to murder, or whether the trial court erred by denying his motion for a new trial based on the weight of the evidence.**

¶51. Thames argues that the State presented insufficient evidence to prove that he acted as an accessory after the fact to murder. Thames contends that the State never proved that he had knowledge of a completed crime of murder as statutorily defined. Thames acknowledges that he admitted to investigators that he knew a shooting had occurred after Lofton and the others informed him afterwards that Lofton's version was that they had only returned fire, so the element of premeditation was lacking. Thames contends that he only had knowledge of them unloading their weapons from the vehicle at Ashton's trailer. And Thames maintains that he instructed that the vehicle used in the shooting be removed from Ashton's out of fear of retaliation from the Vice Lords. Thames further contends that there was no proof that any of the shooters had been convicted of murder. And just because Lofton and the others had arguably participated in a conspiracy to commit murder does not prove that a murder occurred.

17

¶52. Alternatively, Thames contends that the jury's verdict was contrary to the overwhelming weight of the evidence and that the trial court erred by denying Thames's motion for a new trial.

¶53. When reviewing the sufficiency of the evidence, this Court views the evidence in a light most favorable to the State to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Barton v. State*, 303 So. 3d 698, 701 (Miss. 2020) (internal quotation marks omitted) (quoting *Thomas v. State*, 277 So. 3d 532, 535 (Miss. 2019)). All favorable inferences reasonably drawn from the evidence go to the benefit of the State. *Id.* (citing *Thomas*, 277 So. 3d at 535).

¶54. When reviewing a challenge to the weight of the evidence, this Court views the evidence in a light most favorable to the verdict. *Cyrus v. State*, 248 So. 3d 760, 762 (Miss. 2018). This Court will not disturb a jury verdict on a weight-of-the-evidence challenge, unless we find that the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Potts v. State*, 233 So. 3d 782, 791 (Miss. 2017) (internal quotation marks omitted) (quoting *Clemons v. State*, 199 So. 3d 670 (Miss. 2016)).

¶55. Accessory after the fact contains the following elements:

> (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony; and (3) such aid or assistance was rendered with the intent to enable the felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.

*Mangum v. State*, 762 So. 2d 337, 342-43 (Miss. 2000) (citing Miss. Code Ann. § 97-1-5).

> To render one liable as an accessory after the fact he must have had actual knowledge, at the time he relieved or assisted the principal, that the latter had committed a felony, or was an accessory before the fact to a felony; and such knowledge must be personal as distinguished from constructive.

*Matula v. State*, 220 So. 2d 833, 834 (Miss. 1969) (quoting 22 C.J.S. *Criminal Law* § 96 (1961)).

¶56. Thames's indictment charged him with knowingly assisting Lofton, Myers, Chapman, and Jones to avoid arrest and to conceal evidence after the commission of a felony, at a time when Thames knew that the four committed the crime of murder, "by cleaning up the vehicle used in the commission of the murder and concealing and disposing of physical evidence, all with the intent to enable [the four] to avoid arrest and prosecution for the murder of Jamarkus Townsend."

¶57. The State was not required to prove that any one of the shooters had been convicted of murder. *See* Miss. Code Ann. § 97-1-5(3) (Rev. 2014) ("In the prosecution of an offense under this section, it shall not be necessary to aver in the indictment or to prove on the trial that the principal has been convicted or tried."). Rather, the State had to prove that Lofton, Myers, Chapman and Jones feloniously killed Townsend, and that Thames, with knowledge thereof, committed specific acts afterwards with intent to enable any one of the four shooters "to escape or to avoid arrest, trial, conviction or punishment . . . ." Miss. Code Ann. § 97-1-5(1).

¶58. "The killing of a human being without the authority of law" constitutes murder in Mississippi "[w]hen done with deliberate design to effect the death of a person killed[;]" or, "[w]hen done in the commission of an act eminently dangerous to others and evincing a

19

depraved heart, regardless of human life, although without premeditated design to effect the death of any particular individual[;]" or, "when done without design to effect death by any person engaged in the commission of any felony other than [a capital felony.]" Miss. Code Ann. § 97-3-19(1)(a), (b), (c) (Supp. 2019).

¶59. The State presented sufficient, substantive evidence that Townsend's killing resulted from either a planned execution or an eminently dangerous depraved-heart act, or from a felonious drive-by shooting. Thames's jury was presented evidence that Thames gave the four shooters the "green light" to go shoot a rival gang member or to go shoot up a rival gang member's house. *See* Miss. Code Ann. § 97-3-109 (Rev. 2014) (drive-by-shootings). The death of another resulting directly from either scenario constitutes murder under Section 97-3-19. Lofton's claim that the four were fired upon first after driving by Grass's house is of no moment in light of other evidence presented that the four drove down Tillman Street with criminal intention to fire their weapons at Grass's house, "green lighted" by Thames.

¶60. Evidence was presented that after the shooting the four drove to Ashton's place where the guns (at least one of which Lofton said was provided by Thames) were removed from the vehicle. Thames admittedly knew at that point that a shooting had occurred and from other evidence presented, a rational juror could conclude that Thames also knew that it was an illegal shooting.

¶61. Evidence was presented that Thames then assisted with concealing or disposing of physical evidence used in the crime. In one of his sworn testimonies, Lofton said that after the guns were removed from the vehicle, Thames took the guns with him to another location.

That Thames, in his statement(s) to investigators, denied having anything to do with removing the guns simply presented a conflict in the evidence for the jury to resolve.

¶62. Thames also admitted that he assisted one of shooters in taking the vehicle used in the shooting to another location away from Ashton's trailer. Thames said he followed behind Jones in another vehicle as Jones drove the vehicle to his "papaw's" place. Thames's claim that he did so only out of fear of retaliation likewise presented conflict in the evidence for the jury to resolve.

¶63. Regardless, from all the substantive evidence presented, a rational juror could conclude that Thames, knowing that an illegal shooting had occurred, knowingly assisted the principals by helping to conceal and dispose of physical evidence.

¶64. Because the grand jury assigned murder as the underlying offense to the accessory-after-the-fact charge, the State was required to prove that the victim was dead at the time Thames committed any acts of assistance and that Thames knew so. Thames admitted that when he and Ashton had returned back to Ashton's place after following Jones to his relative's place, he learned that Townsend had died. Thames and the group then went to sleep. The next morning, according to Thames, Ashton drove him (Thames) to his mother's house. Ashton then drove Lofton, Myers, and Chapman to a Black Disciple member's house in Meridian where the three hid out until all of them were eventually located and arrested weeks later. According to Lofton, Ashton did so on Thames's instructions.

¶65. From this evidence, a rational juror could conclude that a murder had occurred. And Thames, knowing that a murder had occurred, thereafter knowingly assisted those responsible for the murder to escape or avoid arrest.

¶66. We find that Thames's conviction for accessory after the fact to murder is supported by sufficient evidence. And we do not find that the jury's guilty verdict is contrary to the weight of the evidence.

## CONCLUSION

¶67. For these reasons, Thames's conviction for accessory after the fact to murder is affirmed.

¶68. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**